**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Case No: 5:23-cv-00489**

| | | |
|---|---|---|
| **CHRISTOPHER CAUDILL; RACHEL NIKETOPOULOS; and DAVID FRIEDLANDER, A/K/A DOVID FRIEDLANDER,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| | ) | **COMPLAINT** |
| **THE NORTH CAROLINA SYMPHONY SOCIETY, INC.; THE NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES; and SANDI MACDONALD,** | ) ) ) ) ) ) ) | **Jury Trial Demanded** |
| **Defendants.** | ) ) | |

## INTRODUCTION

1.      Music brought Plaintiffs Chris Caudill, Rachel Niketopoulos, and Dovid Friedlander together. Defendants The North Carolina Symphony Society, Inc. (the "Symphony"), the North Carolina Department of Natural and Cultural Resources ("DNCR"), and Sandi Macdonald, the Symphony's President and Chief Executive Officer, tore Plaintiffs apart—first from their musician colleagues and the audiences they inspired for more than fifteen years and then, ultimately, from their very livelihoods. At its core, this lawsuit is about religious freedom and the discriminatory exercise of power by a State institution that wielded its authority to wreck the careers of three dedicated musicians.

2.      In 2021, the Symphony announced a vaccine mandate, requiring all musicians to be vaccinated against COVID-19 to keep playing music. The Symphony allowed musicians to

1

request medical and religious exemptions. Chris and Rachel are practicing Buddhists. Dovid is a practicing Jew. Plaintiffs could not receive a COVID-19 vaccine without compromising their faith, so they submitted religious accommodation requests and expected they would be quickly granted. After all, before the COVID-19 vaccines had ever been authorized, Symphony musicians gathered to broadcast online performances, subject to testing and physical distancing. To Plaintiffs' surprise, however, Ms. Macdonald put them on unpaid leave, preliminarily denied their requests, and ultimately terminated their employment for failing to take the vaccine.

3.     After being placed on unpaid leave, Plaintiffs expected the Symphony to honor its promise of continued dialogue in hope of finding a resolution. After all, as Plaintiffs pointed out to the Symphony, by that time the organization was allowing unvaccinated spectators to pack into its venues. What made Plaintiffs so different? The Symphony was not persuaded, terminating Plaintiffs' employment while standing immovable and inflexible on its mandate. Until recently, that is.

4.     In a remarkable move, the Symphony lifted its COVID-19 vaccine mandate in early August 2023. Yet it has not reinstated Plaintiffs to their prior positions. What is worse, Defendants' newfound flexibility was not the result of evolving science, but the pursuit of $4 million in taxpayer money from the North Carolina General Assembly. As Ms. Macdonald put it, "[i]f we are going to remove our mandate in the fall, it behooves us to do it now . . . to limit jeopardizing our relationships" with the State legislature.

5.     Ms. Macdonald took a very different approach with Plaintiffs. She did not just jeopardize their "relationship" with the Symphony; she cut them off entirely. What Defendants did was intentional, discriminatory, and punitive, creating a wake of financial and professional consequences. They must be held accountable.

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff Chris Caudill is a resident of Wake County, North Carolina and a former employee of the Symphony and /or the DNCR.

7.      Plaintiff Rachel Niketopoulos is a resident of Wake County, North Carolina and a former employee of the Symphony and / or the DNCR.

8.      Plaintiff David Friedlander, also known as Dovid Friedlander, is a United States citizen and a former employee of the Symphony and /or the DNCR. Dovid currently resides in Mexico with his family because of the financial hardship Defendants created for him as alleged herein.

9.      Defendant The North Carolina Symphony Society, Inc. is a North Carolina non-profit corporation established in 1933 with its headquarters located in Wake County, North Carolina. At all times relevant herein, the Symphony was a state actor acting under color of state law.

10.     Defendant the North Carolina Department of Natural and Cultural Resources is a cabinet-level department within the state government of North Carolina dedicated to overseeing projects in the arts, culture, and history within the State. The DNCR was formerly known as the "North Carolina Department of Cultural Resources."

11.     Defendant Sandi Macdonald is the President and Chief Executive Officer of the Symphony. Ms. Macdonald resides in and performs her duties for the Symphony in Wake County. At all times relevant herein, Ms. Macdonald was a state actor acting under color of state law.

12.     This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1983, and the United States Constitution. The Court has subject matter jurisdiction under

3

28 U.S.C. § 1331.

13.    This Court has personal jurisdiction over Defendants because they are residents of North Carolina and / or they purposefully availed themselves of the privilege of conducting activities in North Carolina, Plaintiffs' claims arose out of those activities, and the exercise of personal jurisdiction is constitutionally reasonable.

14.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants reside in North Carolina and / or a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

### I.    The North Carolina Symphony: "North Carolina's state orchestra"

15.    In 1943, the North Carolina General Assembly passed legislation known as the "Horn Tootin' Bill."[1] The bill was "the first appropriation bill to support a symphony orchestra [in the United States] and put the [Symphony] under the 'patronage and control'" of the State of North Carolina.[2]

16.    In 1973, the General Assembly enacted the Executive Organization Act to reorganize State government. 1973 N.C. Sess. Laws ch. 476. Under the Act, which remains the law today, the Symphony was organized under the DNCR. Specifically, the Act provides that "the

---

[1] Kim L. Wangler, *The North Carolina Symphony: An Analysis of the Financial, Social, and Political Implications for a State Supported Arts Organization* (2018) at 86, available online at https://www.meiea.org/resources/Proceedings/2018/MEIEA%20Summit%202018%20Wangler.pdf (last visited Aug. 30, 2023).

[2] Wangler, *supra* note 1, at 88; *see also* North Carolina Department of Natural and Cultural Resources Website, *The North Carolina Symphony Makes Its Debut*, https://www.dncr.nc.gov/blog/2016/05/14/north-carolina-symphony-makes-its-debut (noting that the Symphony was the "first symphony orchestra [in the United States] to receive state aid") (last visited Aug. 30, 2023).

functions of . . . the North Carolina Symphony Society, Inc." are "hereby . . . vested in the [DNCR]." N.C. Gen. Stat. § 143B-51(b); *see also id.* § 143B-53(a), (b) (providing that the DNCR "shall be organized to include . . . the North Carolina Symphony Society, Inc.").

17.     According to the DNCR, it "manages . . . the [Symphony]."[3] The DNCR's website contains scores of pages devoted to the Symphony.[4] From the DNCR website, visitors can obtain general information about the Symphony, read press releases about Symphony operations and performances, and link to the Symphony website, where they can view the Symphony's calendar, buy tickets to Symphony performances, and donate to the Symphony.[5]

18.     The Symphony has "a board of trustees consisting of not less than 16 members of which the Governor of the State and the Superintendent of Public Instruction shall be ex officio members." N.C. Gen. Stat. § 143B-94. Further, the Governor appoints four other board members. *Id.*

19.     Under State law, "[t]he operations" of the [Symphony] . . . shall be subject to oversight of the State Auditor." N.C. Gen. Stat. § 140-8. In addition, "[a]ll expenditures made by [the Symphony] are subject to the . . . State Budget Act." *Id.*

20.     The DNCR website contains a page devoted to Ms. Macdonald, which lists her as a member of the DNCR's "[l]eadership."[6] Several other high-level employees of the Symphony

---

[3] DNCR Website, *About Us*, https://www.dncr.nc.gov/about-us (last visited Aug. 30, 2023).

[4]     DNCR     Website,     *Search     results     for     'symphony,'* https://www.dncr.nc.gov/search/ncdncr?keys=symphony (last visited Aug. 30, 2023).

[5] *Id.*; *see also* Symphony Website https://www.ncsymphony.org, (last visited on Aug. 30, 2023).

[6] DNCR Website, *About Us—Leadership,* https://www.dncr.nc.gov/about/leadership/sandi-macdonald#:~:text=Sandi%20Macdonald%20joined%20the%20North,annual%20performances%20across%20the%20state (last visited Aug. 30, 2023).

are also listed on the DNCR's webpage as employees of the DNCR. These employees include the Symphony's Human Resources and Office Systems Manager (Tiffany Haddock), Accounting and Payroll Manager (Carol Brown), Director of Advertising and Corporate Partnerships (Maria Ewing), Communications Project Manager (Richard Hess), Graphic Designer (Jennifer Blackman), and Executive Assistant to the President and CEO (Stephen Thompson).[7]

21.    State law provides that the Symphony shall operate "under the patronage of the State," N.C. Gen. Stat. § 143B-94, and the Symphony receives significant State funding. In recent years, the Symphony has received over $4 million annually from the State, a figure that comprises approximately one third of the Symphony's annual budget.[8] The Governor and the Council of State are also authorized "to allot such sums [to the Symphony] as they may deem appropriate, from the Contingency and Emergency fund, . . . to aid in carrying on [its] activities." N.C. Gen. Stat. § 140-9.

22.    North Carolina law contains no provision stating that obligations of the Symphony

---

[7]    DNCR Website, *Tiffany Haddock*, https://www.dncr.nc.gov/employee-detail/64ef446da9ac861316eaa112 (last visited Aug. 30, 2023); DNCR Website, *Carol Brown*, https://www.dncr.nc.gov/employee-detail/64ef446da9ac861316eaa117 (last visited Aug. 30, 2023); DNCR Website, *Maria Ewing*, https://www.dncr.nc.gov/employee-detail/64ef446da9ac861316ea9cf7 (last visited August 25, 2023); DNCR Website, *Richard Hess*, https://www.dncr.nc.gov/employee-detail/64ef446da9ac861316ea9cbe (last visited Aug. 30, 2023); DNCR Website, *Jennifer Blackman*, https://www.dncr.nc.gov/employee-detail/64ef446da9ac861316ea9ca7 (last visited Aug. 30, 2023); DNCR Website, *Stephen Thompson*, https://www.dncr.nc.gov/employee-detail/64ef446da9ac861316eaa2a0 (last visited Aug. 30, 2023); Symphony Website, *Our People*, https://www.ncsymphony.org/our-people/#1492408542899-c6b05c2b-30cb (last visited Aug. 30, 2023).

[8] Wangler, *supra* note 1, at 88; *see also North Carolina Symphony Society Inc. Form 990* FYE June 2022 at 10, available online at https://projects.propublica.org/nonprofits/organizations/560556755/202310479349301951/full (providing that the Symphony's total operational expenses for the fiscal year ending June 2022 were $14,004,331) (last visited Aug. 30, 2023); *see also* DNCR Website, *supra* note 6 (providing that the Symphony's annual operations are $12 million).

are not binding on the State. Further, the practical effect of North Carolina's treatment of the fiscal affairs of the Symphony definitively impacts the state treasury.

23. Under State law, employees of the Symphony are considered State employees. N.C. Gen. Stat. § 126-5(c11)(2). Symphony employees are eligible to join the State Employees' Credit Union, a closed credit union available to certain governmental employees and their immediate families. Plaintiffs are members of State Employees' Credit Union through their employment with the Symphony.

24. The Symphony is involved in statewide—verses local—concerns. The Symphony's Mission Statement provides that the Symphony is "to be North Carolina's state orchestra," and that the Symphony embraces its "dual legacies of statewide service and music education."[9] Pursuant to that mission, the Symphony conducts "more than 300 concerts, education programs, and community engagement offerings . . . in all 100 North Carolina counties."[10] The Symphony is "committed to engaging students of all ages across North Carolina," and "[i]n alignment with the curriculum set by the North Carolina Department of Public Instruction, the Symphony provides training and resources for teachers" across the State.[11] The Symphony boasts that "[n]o other orchestra in America serves its state to the extent that the North Carolina Symphony does."[12]

25. Historically, the Symphony has not attempted to hide its close affiliation with the

---

[9] Symphony Website, *Our Story*, https://www.ncsymphony.org/our-story/ (last visited Aug. 30, 2023).

[10] *Id.*

[11] *Id.*

[12] Symphony Website, *About Us*, https://www.ncsymphony.org/about-us/ (last visited Aug. 30, 2023).

State. In December 2002, the footer on the Symphony's website included the following image referencing the DNCR and containing the tagline "A Division of the N.C. Department of Cultural Resources:"[13]



Upon information and belief, based on historical images available online, the Symphony published some version of this descriptive tagline on its website for nearly twenty years.[14]

26.     Recently, however, it appears that the Symphony has attempted to distance itself from the DNCR. Today, rather than highlight its relationship with the DNCR, the Symphony's website says the organization "gratefully acknowledges financial support from Wake County, the City of Raleigh, and the State of North Carolina" and contains symbols of the DNCR, Wake County, and the City of Raleigh, as shown in the image below:[15]

---

[13] Internet Archive, Capture of Symphony Website as of Dec. 14, 2002, https://web.archive.org/web/20021214095632/http://www.ncsymphony.org/about/index.cfm (last visited Aug. 30, 2023).

[14] Internet Archive, Capture of Symphony Website as of Dec. 5, 2006, https://web.archive.org/web/20061205062640/http://ncsymphony.org/ (last visited Aug. 30, 2023); Internet Archive, Capture of Symphony Website as of Aug. 11, 2015, https://web.archive.org/web/20150801190638/http://ncsymphony.org/ ("The North Carolina Symphony is a division of the Department of Cultural Resources.") (last visited Aug. 30, 2023); Internet Archive Capture of Symphony Website as of Jan. 29, 2021, https://web.archive.org/web/20210129201733/https://www.ncsymphony.org/ (last visited Aug. 30, 2023).

[15] Symphony Website, *supra* note 4.



27. On information and belief, based on the timing of the Symphony's changes to its webpage in relation to the events alleged herein, the Symphony altered its webpage in an effort to conceal or downplay its affiliation with the State of North Carolina for the purpose of avoiding the strictures of the United States Constitution.

28. Despite the Symphony's efforts to distance itself from the DNCR, the legal relationship between the two has not changed.

29. The DNCR professes its commitment to equity and inclusion. One of the Department's stated values is "an open-minded approach to understanding people, regardless of

their . . . religion . . . or other characteristics."[16] In addition, the Symphony professes to treat all employees the same "without regard to . . . religion." Despite these commitments, Defendants chose to denigrate Plaintiffs' religion and engage in religious discrimination against them by failing to accommodate their sincerely held religious beliefs.

## II.  Plaintiffs' background in music and faith

30.     Plaintiffs are children of the Midwest. Music brought them to Raleigh. Years of hard work and dedication landed them a spot with the Symphony, something scores of musicians across the country strive for but never attain.

31.     Chris has been playing the French horn since the age of ten. His passion for the horn drove him to study at Northwestern University, and ultimately to tour overseas, and then to Miami, Florida, and Virginia, to play in the New World Symphony and Virginia Symphony, respectively. In June 2003, Chris came to Raleigh, North Carolina, auditioning for and ultimately earning a coveted spot in the Symphony's horn section.

32.     Rachel first picked up the French horn when she was eleven years old. She studied music at the University of Iowa and the University of Missouri. Rachel toured Europe with the North Carolina School of the Arts Orchestra and the New World Symphony. She also trained at the Alexander Alliance in Philadelphia, and currently serves as adjunct faculty at the University of North Carolina at Chapel Hill, Duke University, and the University of North Carolina at Greensboro. Rachel joined the Symphony in 2005. In her free time, Rachel volunteers, sharing her passion for music with children and students and teaching yoga and mindfulness to female prisoners.

---

[16] N.C. Department of Cultural and Natural Resources [sic] Strategic Plan, 2023-25, https://www.osbm.nc.gov/documents/files/strategic-plan-dncr/open (last visited Aug. 30, 2023).

33.     Chris and Rachel are married. The couple met while working together for the New World Symphony in Miami, Florida. After Rachel joined the Symphony in 2005, the couple became a fixture in the Symphony's horn section. Fully aware of their talents and unique story, the Symphony is leveraging Chris and Rachel's name, image, and likeness to this very day. The Symphony's YouTube channel features a two-minute video of the couple "show[ing] off their festive Baroque horns."[17] A true and accurate frame from the video is shown below.



34.     Originally from Pittsburgh, Pennsylvania, Dovid has been playing the violin for more than forty years, starting when he was three years old. At the age of nine, Dovid attended the internationally renowned Meadowmont School of Music before studying at the Eastman School of Music and Cleveland Institute of Music. Dovid won a spot with the Symphony more than fifteen

---

[17]     North Carolina Symphony, *The Most Festive Instrument of All*, https://www.youtube.com/watch?v=z_pPEDchScM&t=17s.

years ago and has served the orchestra with distinction during that time. A life-long performer, Dovid shares his love of music and the violin with students from all walks of life around the world.

35.     In addition to music, Plaintiffs have another important thing in common: they are people of faith whose religious beliefs inform everything they do. Chris was raised in a traditional Roman Catholic family in Oklahoma. In his twenties, he started exploring other religions. Chris was introduced to Buddhist teachings, finding the teachings of Christianity and Buddhism to be compatible, and coming to believe that the infinite mercy of Jesus Christ is essentially the same as the infinite compassion of the Buddha. Chris believes that mercy and compassion must extend to all living things, not just human beings, but animals. Through daily prayer and meditation, Chris works to put Buddhist precepts into action. Consistent with these religious beliefs, Chris does not eat meat and avoids purchasing and using products that have been tested on animals.

36.     Rachel did not grow up in a religious household. Her faith journey started in college in Iowa, where she discovered Buddhism in a class on world religions. Rachel was drawn to the Buddhist way of looking at both spiritual and physical worlds. Buddhist teaching reinforced Rachel's love for animals. In living out her faith, Rachel has not eaten meat in decades and avoids using any products that have been tested on animals. Regarding the latter, Rachel observed animal testing during a work study assignment in college. The incident shaped her religious outlook, and is one she often remembers, strengthening her resolve in her Buddhist faith to avoid any products tested on animals. Like Chris, based on her religious beliefs, Rachel avoids knowingly using any products that are not labeled "cruelty free."

37.     Rachel brought all those beliefs with her to both the Symphony and to her new home in Raleigh. In 2005, just before auditioning for a role in the horn section of the Symphony, Rachel quietly recited the Buddhist "Affirmations of Peace." The audition went well and the

Symphony hired her. Since 2010, Rachel has taught yoga for a program to help female inmates acclimate to life after incarceration. This community service is an outworking of Rachel's Buddhist religious beliefs as she refused to accept compensation for hundreds of hours of her time.

38.     Dovid grew up in a practicing, observant Jewish household. He attended a private Orthodox Jewish school where he learned the Torah by sitting under the teaching of Orthodox rabbis. That experience shaped Dovid and made him into the man of faith he is today. Dovid believes human beings are created in the image of God, Genesis 1:27, and that his body is and should remain the way God made it. Dovid follows the teachings of the Torah, and avoids taking any "unclean" thing or animal into his body. Dovid does not eat pork or other unclean animals. Because he believes his body is as God intends it to be, Dovid also avoids taking any medications or vaccines. Consistent with this religious belief, Dovid does not medicate or vaccinate himself or his child, and he has diligently sought religious accommodations from any requirements.

## III.     Defendants impose a COVID-19 vaccine mandate and Plaintiffs seek an accommodation based on their sincerely held religious beliefs.

39.     Plaintiffs were content to live out quiet lives of faith in the Symphony and in the Raleigh area. The COVID-19 pandemic changed everything. As they were for everyone, the early days of the pandemic were difficult enough for Plaintiffs. They have always been performers who thrive on sharing their musical gifts with audiences. The public policy response to COVID-19 took that away from them. While people were allowed to congregate in big box retailers, liquor stores, and other "essential" organizations, the Symphony shuttered its doors, cancelled all live performances, and cut Plaintiffs' salaries by twenty percent.

40.     As lockdown orders abated, the Symphony started to chart a course toward reopening. During the fall of 2020 and into 2021, the orchestra broadcasted performances online. During these performances, select members of the Symphony gathered, with individual members

testing for COVID-19, engaging in physical distancing, and performing indoors while separated by plexiglass shields. During this period, the Symphony allowed string players to set up one player to a stand, creating six feet of distance between musicians. Upon information and belief, no one became ill with COVID-19 on account of these performances. Simply put, the show went on. The Symphony did this all before the advent of the COVID-19 vaccines.

41.     When the first COVID-19 vaccine received an emergency use authorization from the Food and Drug Administration in December 2020, the Symphony made no moves to require vaccinations among its musicians. As late as spring 2021, when optimism about the efficacy of the vaccines was at its zenith, the Symphony indicated it would not issue any vaccine mandates. This was not surprising to Plaintiffs, because the Symphony does not require any other vaccines.

42.     Everything changed dramatically in August 2021, when the Symphony and the North Carolina Symphony Player's Association announced a COVID-19 Vaccination Policy for the 2021-2022 season.[18] The Policy provided that, to be part of the orchestra, musicians must receive COVID-19 vaccinations or have a medical or religious exemption from the requirement.

43.     Chris and Rachel were part of the Symphony's labor union. Around that time, their union's Orchestra Committee ("OC") indicated that Management would provide musicians with "Religious Accommodation Request Forms." At no point during the rollout of the mandate did the Symphony indicate that no religious accommodations would be granted. In fact, according to the COVID-19 Vaccination Policy, the Symphony laid out the protocol for individuals who were approved for a religious accommodation based on bona fide religious reasons, which included "twice weekly PCR testing during all weeks of the [2021–2022] season." Under the Policy, if the PCR test was positive, the musician would be placed on paid leave until they tested negative.

---

[18] The Symphony's season generally runs approximately from late September through early June.

44.     On September 13, 2021, the OC explained that, in addition to the PCR testing requirement, "any approved/exempted unvaccinated players" would also play in a socially distanced manner.

45.     Despite the fact the Policy specifically contemplated religious accommodations from the vaccine mandate, the Symphony attempted to deter employees from seeking religious exemptions. Specifically, the Symphony's religious accommodation request form required employees to obtain a signed statement from a spiritual leader certifying that they "support the religious basis for the [employee's] request for an accommodation or exemption." Neither Title VII of the Civil Rights Act of 1964 nor the United States Constitution require such a certification for an employer to grant a religious accommodation request.

46.     In accordance with the terms of the Symphony's COVID-19 Vaccination Policy, in early September 2021, Plaintiffs all sought religious accommodations from the vaccination requirement. In their requests, Chris and Rachel cited their Buddhist beliefs. In this regard, neither of them could take any of the available COVID-19 vaccines without violating their Buddhist faith because the vaccines had been tested on animals and cell lines from aborted fetal cell were used in testing / production of the vaccines.[19]

47.     Dovid also concluded that he could not take any of the COVID-19 vaccines without

---

[19] These facts are not subject to dispute. *See The Important Role of Animal Research in mRNA COVID-19 Vaccine Development*, National Institute of Allergy and Infectious Diseases, Aug. 18, 2021, https://www.niaid.nih.gov/news-events/role-animal-research-mrna-covid-19-vaccine-development (discussing use of animals in development of the COVID-19 vaccines) (last visited in Aug. 30, 2023); James Lawler, MD, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells*, Nebraska Medicine, August 18, 2021, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells (noting that "fetal cell lines—cells grown in a laboratory based on aborted fetal cells collected generations ago—were used in testing during research and development of the mRNA vaccines, and during production of the Johnson & Johnson vaccine") (last visited in Aug. 30, 2023).

violating his Jewish faith. Dovid believes his body is a temple. Under Dovid's understanding of the Torah, G-d's binding moral law, Dovid is not allowed to alter or defile his body—Dovid believes he is G-d's creation and his body is the way the Almighty intended for it be. This means he conscientiously avoids medicine and vaccines in general. As an adult, Dovid has not received any vaccines and he seeks religious accommodations from any vaccine requirements applicable to himself and his child. Dovid also refrains from taking anything into his body which is unclean, and that includes products involving unclean animals such as pigs. For Dovid, the fact that other Jews reached different conclusions about the COVID-19 vaccines is consistent with his own religious experience. Throughout his religious life, Dovid's rabbis have consistently instructed him to ask questions and disagree. The act of accepting a course of action simply because it is "recommended" or what others view as "best for him" would also violate Dovid's conscience.

48. Relevant here, beyond requesting a narrow accommodation for their consciences, Plaintiffs did not ask Defendants for special treatment. Plaintiffs did not ask Defendants for any kind of blanket exemption—they were all ready, willing, and able to take reasonable measures to mitigate the spread of COVID-19, including by engaging in periodic testing, masking, and physical distancing. Moreover, Rachel expected her request to be granted expeditiously because Duke University and the University of North Carolina system, places where Rachel also worked and performed, had already had granted her request for a religious exemption from their COVID-19 vaccine requirements. Unfortunately, as Plaintiffs learned soon after submitting their accommodation requests, none of that was enough for the Symphony.

## IV. Defendants preliminarily deny Plaintiffs' requests for a religious accommodation.

49. On September 14, 2021, Ms. Macdonald preliminarily denied Plaintiffs' accommodation requests. These preliminary denials were ostensibly predicated on two findings. First, Ms. Macdonald found that Plaintiffs "submitted insufficient information to qualify for

consideration for an accommodation based on your identified beliefs." This objection was misplaced. Plaintiffs explained their religious beliefs and related objections to the COVID-19 vaccines in sufficient detail to establish that their objections were both based on religion and sincerely held. But Plaintiffs got the message—Defendants did not actually want more information. Instead, Ms. Macdonald was casting doubt on whether Plaintiffs even held their religious convictions in the first place.

50.     The second basis for the preliminary denial was Ms. Macdonald's conclusion that granting Plaintiffs' requests would present an "undue hardship" on the Symphony. In particular, Ms. Macdonald stated that it "would be impossible to maintain the social distancing that would be required under applicable CDC guidance for an unvaccinated person in these settings, onstage, backstage, and on buses." Ms. Macdonald made this finding despite the fact the COVID-19 Vaccination Policy itself contemplated that accommodation was possible with regular testing.

51.     After preliminarily denying Plaintiffs' religions accommodation requests, Ms. Macdonald placed them on unpaid leave with health benefits through the 2021–2022 season. Ms. Macdonald promised that she would re-evaluate Plaintiffs' status and meet with them by April 1, 2022, to discuss whether the Symphony could accommodate them after that time.[20] Based on this promise, Plaintiffs hoped the Symphony might revisit its position, particularly after the Omicron variant became the dominant variant in the United States in late 2021 and early 2022 and symphonies and other types of businesses across the country did away with their vaccine mandates. Reasonably relying on the Symphony's promise of an open dialogue, and with the hope that a resolution could be reached before or at the April 1 meeting, Plaintiffs elected not to file a charge

---

[20] The April 1 meeting was also contemplated under the Policy itself, which stated that "[i]f at the end of the 2021–2022 season the musician is still unvaccinated their status will be reviewed and discussed to determine what their long-term plans are with the organization."

with the Equal Opportunity Employment Commission at that time.

52.     Though the Symphony preliminarily denied Plaintiffs' religious accommodation requests, the orchestra took a very different position regarding unvaccinated spectators. While the Symphony was denying Plaintiffs the right to perform on stage, it allowed unvaccinated spectators to attend performances simply by providing a negative COVID-19 test. Masking was also required in certain venues, but generally only if the local jurisdiction had a mask mandate, and those mandates were relaxed during the 2021–2022 season. By March 2021, masking was no longer required in the Meymandi Concert Hall. As shown in the pictures below from the Symphony's social media account during this time period, vaccinated and unvaccinated people alike were allowed to crowd into concert halls in Raleigh and points beyond and sit shoulder to shoulder just steps away from the musicians, but musicians with religious objections to the vaccine were not allowed to perform:[21]



53.     Defendants' refusal to provide Plaintiffs a reasonable accommodation was not supported by science. As an initial matter, requiring Plaintiffs to provide a negative COVID-19 test prior to rehearsals and performances—just as Defendants did for unvaccinated audience

---

[21] X, *NC Symphony*, https://twitter.com/ncsymphony (last visited Aug. 30, 2023).

members—would have mitigated the spread of COVID-19 at least as much as vaccination. The fact that the Symphony allowed unvaccinated audience members to attend performances with a negative test closes the door on any argument that testing was insufficiently protective.

54.     Moreover, additional reasonable accommodations were available. Researchers at the University of Colorado Boulder and University of Maryland found that mitigation measures such as masking and physical distancing significantly reduce the risk of emitting COVID-19 aerosols during musical performances.[22]

55.     In addition, a study by University of Minnesota College of Science and Engineering, researchers found that wind instruments typically do not spread aerosols farther than one foot.[23] The researchers, who were working closely with the Minnesota Orchestra, suggested that mitigation strategies including physical distancing, putting masks over instruments, and using portable filters can help reduce the risk of spreading COVID-19 on musical stages.[24]

56.     Other research suggests that new seating arrangements in orchestras can stop the spread of microbe-carrying droplets among the musicians. Using computation fluid dynamics simulations and quantitative microbial risk assessment, scientists have concluded that mitigation strategies such as rearranging musicians on the stage and implementing strategic use of air filters "can reduce aerosol concentrations in the breathing zone by a factor of 100, corresponding to a

---

[22] *Measurements and Simulations of Aerosol Released while Singing and Playing Wind Instruments*, 2021 ACS Environ. Au, 71-84, available online at https://pubs.acs.org/doi/10.1021/acsenvironau.1c00007 (last visited Aug. 30, 2023).

[23] *Musical instruments don't spread aerosols as far as you might think*, University of Minnesota College of Science & Engineering, https://cse.umn.edu/college/news/musical-instruments-dont-spread-aerosols-far-you-might-think (October 19, 2020) (last visited Aug. 30, 2023).

[24] *Id.*

similar decrease in the probability of infection."[25] According to this research, the highest aerosol-emitting instruments should be placed closest to ventilation systems and open doors.[26] A computer model of airflow in the Utah Symphony's concert hall demonstrates that this strategy limits droplet spread better than six-foot physical distancing.[27]

57.     The Musicians' Union (the "MU") is the United Kingdom's trade union for all musicians, representing over 30,000 members working in the music industry. The MU has worked with numerous orchestra managements across the UK in the past few years to get orchestral players back to work in as safe a way as possible.[28] The MU has identified key elements of minimizing COVID-19 risk such as physical distancing, cleaning regimes, face masks, and ventilation.[29] Notably, the MU "does not support employer systems where you are required to prove your vaccination status in order to be engaged for or carry out work, and protected characteristics should not be discriminated against."[30]

58.     These studies demonstrate that all relevant times it was possible to accommodate Plaintiffs' religious faith while allowing them to play. This is particularly true for Dovid, who plays the violin. Dovid could have simply been subjected to some combination of regular testing,

---

[25] *Mitigation strategies for airborne disease transmission in orchestras using computational fluid dynamics*, Science Advances, Vol. 7, No. 26, https://www.science.org/doi/10.1126/sciadv.abg4511 (June 23, 2021) (last visited Aug. 30, 2023).

[26] *Id.*

[27] *Id.*

[28] *Health and Safety for Orchestral Players Living with COVID-19*, MU, https://musiciansunion.org.uk/working-performing/coronavirus-guidance/workplace-advice/health-and-safety-for-orchestral-players-living-with-covid-19 (last visited Aug. 30, 2023).

[29] *Id.*

[30] *Id.*

wearing a mask, and physical distancing. This would have allowed him to play his instrument with almost no risk of spreading the virus while remaining true to his faith.

59.     Indeed, the true basis for Defendants' preliminary denial of Plaintiffs religious accommodation requests was not that Plaintiffs could not be reasonably accommodated. Rather, as Ms. Macdonald later admitted, she wanted to promote a "culture" of vaccination at the Symphony. Granting accommodations based on religious beliefs—no matter how reasonable those accommodations were—was simply antithetical to the "culture" Ms. Macdonald wanted to promote.

## V.     Defendants fire Plaintiffs. Then, in a politically motivated pirouette, they cancel the COVID-19 vaccine mandate.

60.     Despite Defendants' unreasonable failure to accommodate Plaintiffs' religious accommodation requests for the 2021–2022 season, as the April 1 meeting date approached, Plaintiffs continued to hope that Defendants would revisit their position. But Ms. Macdonald never scheduled the promised meeting. Rather, on May 17, 2022, to Plaintiffs' shock and dismay, Ms. Macdonald sent Plaintiffs a letter summarily informing them that they would be fired, effective June 30, 2022, for failing to comply with the COVID-19 Vaccination Policy.[31] According to Ms. Macdonald, not only was it an undue hardship for the Symphony to allow Plaintiffs to perform with mitigation measures, it had become an undue hardship to continue to provide them unpaid leave with health benefits.

61.     With any opening for future dialogue cut off, Plaintiffs had no choice but to file a Charge of Discrimination with the EEOC. Plaintiffs filed their Charges on or about August 19, 2022 (Rachel), September 19, 2022 (Chris), and October 22, 2022 (Dovid).

---

[31] Dovid did not receive this letter until July 28, 2022, which was after the effective date of his termination.

62.     On June 4, 2023, the EEOC issued Right to Sue letters to Plaintiffs.

63.     After Dovid's termination, the Symphony conducted auditions for and hired Dovid's replacement. To date, the Symphony has not hired Chris or Rachel's replacement. Instead, it is using temporary performers to fill their positions.

64.     Defendants destroyed Plaintiffs' livelihoods. The orchestra community is tight knit, and jobs in orchestras are highly competitive. The devastating financial, professional, and emotional consequences of their terminations are difficult to overstate. Cut off from their primary employment, Chris and Rachel had to supplement their income through teaching jobs and side gigs, playing for other orchestras who allowed unvaccinated musicians to participate. Because of the financial strain the Symphony put on Dovid, he was forced to move to Mexico to provide a life for his wife and child.

65.     Incredibly, after firing Plaintiffs and destroying their careers, the Symphony recently decided to lift its vaccine mandate. What changed? Ms. Macdonald revealed the rationale in a July 2023 e-mail to all musicians in the Symphony. Ms. Macdonald prefaced her e-mail with a comment that "[t]he health and safety of our musicians is our #1 priority," but she acknowledged that "mandates for [COVID-19 shots and boosters] do not exist" under federal and state law. Ms. Macdonald claimed that cancelling the mandate was a move to bring the Symphony in line with "industry standards." What she left out is the fact that many orchestras had accepted musicians' requests for religious accommodations or lifted their vaccine mandates entirely long before July 2023.

66.     And then, Ms. Macdonald revealed the prestige: "The legislature is in the home stretch of their budget negotiations where they are considering +$4M in financial recovery funding from the pandemic for the Symphony, and they are moving quickly behind the scenes." Ms.

Macdonald continued: "If we are going to remove our mandate in the fall, it behooves us to do it now . . . to limit jeopardizing our relationships" with the legislature.[32]

67.     In short, the Symphony lifted the vaccine mandate to get more money from taxpayers. This explains the Symphony's approach to unvaccinated spectators from the start. Precluding the millions of North Carolinians who failed to obtain a COVID-19 vaccine from attending Symphony performances would have been a political non-starter—it would have, to use Ms. Macdonald's words, "jeopardized" the Symphony's relationships with the legislature. Faced with that political reality, but committed to a "culture" of vaccination, Defendants took rearguard action against Plaintiffs, pushing them out of the orchestra and wrecking their professional and financial lives despite their sincerely held religious views and the reasonable accommodations they could and should have been afforded.

## CLAIMS FOR RELIEF
### COUNT I
### Violation of Title VII of the Civil Rights Act of 1964
### Against the Symphony and the DNCR

68.     Plaintiffs incorporate all the allegations of this Complaint as if alleged verbatim herein.

69.     The Symphony and the DNCR engaged in an industry affecting commerce and have fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Thus, the Symphony and the DNCR are employers under Title VII.

70.     Plaintiffs were employed by the Symphony and / or the DNCR. On information and belief, based on the facts that the DNCR "manages" the Symphony, that Ms. Macdonald is

---

[32] It is not clear whether the $4 million dollars Ms. Macdonald referenced in this email is in addition to—or included in—the normal legislative allocation.

considered to be "[l]eadership" within the DNCR, and that certain Symphony employees are also explicitly considered employees of the DNCR—including Human Resources and Office Systems Manager—the DNCR shared or co-determined those matters governing the essential terms of Plaintiffs' employment. Thus, Plaintiffs are employees of the Symphony and / or the DNCR under Title VII.

71.    Throughout their employment, Plaintiffs' job performance was exemplary.

72.    The Symphony and / or the DNCR mandated Plaintiffs take a COVID-19 vaccine as a condition of employment.

73.    Plaintiffs' sincere religious beliefs, observances, and practices forbid them from taking any of the COVID-19 vaccines.

74.    Plaintiffs informed the Symphony and / or the DNCR that their sincere religious belief, observance, and practice conflicted with the vaccine mandate and requested a reasonable accommodation from it. These requests constituted protected activity under Title VII.

75.    The Symphony and / or the DNCR denied Plaintiffs a reasonable accommodation from the vaccine mandate. Instead, the Symphony and / or the DNCR placed Plaintiffs on unpaid leave because of their accommodation request. Subsequently, the Symphony and / or the DNCR fired Plaintiffs because they failed to comply with the vaccine mandate and because they requested a religious accommodation from it. Placing Plaintiffs on unpaid leave and terminating their employment constitutes adverse action under Title VII.

76.    The Symphony and / or the DNCR could have accommodated Plaintiff's religious beliefs, observances, and practices without undue hardship. The Symphony did not actually undertake to thoroughly evaluate whether reasonable accommodations were possible on an individualized basis; rather, pursuant to its "culture" of vaccination, it categorically denied

Plaintiffs' requests.

77.    The denial of Plaintiffs' requested religious accommodation and firing of Plaintiffs violates Title VII.

78.    Plaintiffs have exhausted their administrative remedies by filing a Charge of Discrimination with the EEOC and / or the Symphony and / or the DNCR should be equitably estopped from denying that Plaintiffs have exhausted their administrative remedies.

79.    Plaintiffs timeline alleged their Title VII claims as set forth herein within 90 days of receipt of the EEOC's Right to Sue letter.

80.    The actions of the Symphony and / or the DNCR damaged Plaintiffs.

**COUNT II**
**Violation of 42 U.S.C. § 1983**
**(Free Exercise Clause)**
**Against the Symphony and Ms. Macdonald**

81.    Plaintiffs incorporate all the allegations of this Complaint as if alleged verbatim herein.

82.    The Free Exercise Clause of the First Amendment to the United States Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. 1. The Free Exercise Clause applies against the states and state actors.

83.    State action that burdens the exercise of religion is subject to strict scrutiny if it not both neutral to religion and generally applicable irrespective of religion.

84.    The Symphony's COVID-19 vaccine mandate burdened Plaintiffs exercise of religion. Plaintiffs' sincerely held religious beliefs compelled them to refuse the COVID-19 vaccine.

85.    State action is not neutral toward religion when it proceeds in a manner that is intolerant of religious beliefs or restricts practices because of their religious nature.

86.     State action is not generally applicable when it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individual exemptions. In addition, state action is not generally applicable when it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.

87.     Defendants did not act neutrally toward religion. Despite the fact the Symphony's COVID-19 Vaccination Policy contemplates both medical and religious accommodations, Defendants categorically denied Plaintiffs' religious accommodation requests on the ground that no accommodations were possible. This exhibits an intolerance of and discrimination against religion.

88.     Defendants did not act in a generally applicable way toward religion. The vaccine mandate provided a mechanism for musicians to obtain individualized exemptions for medical reasons, requiring Defendants to provide a compelling reason for denying Plaintiffs' accommodation requests. In addition, despite the fact the Symphony's COVID-19 Vaccination Policy contemplates both medical and religious accommodations, Defendants categorically denied Plaintiffs' religious accommodation requests on the ground that no accommodations were possible. In this way, Defendants prohibited religious conduct despite the fact, by the terms of the Policy, it would have permitted secular conduct that undermines the Symphony's asserted interests in a similar way. Further, by allowing members of the audience to attend performances with nothing more than a negative COVID-19 test and a mask, Defendants prohibited Plaintiffs' religious conduct while permitting secular conduct that undermined Defendants' asserted interests in a similar way.

89.     Defendants could have accommodated Plaintiff's religious beliefs, observances, and practices. Defendants did not actually undertake to thoroughly evaluate whether reasonable

accommodations were possible on an individualized basis; rather, pursuant to its "culture" of vaccination, it categorically denied Plaintiffs' requests.

90.     Defendants had no compelling, substantial, legitimate, or rational interest in denying Plaintiffs' requests for a religious accommodation. Because Defendants would have permitted secular conduct that undermines the Symphony's asserted interests pursuant to medical exemptions for musicians and by way of spectator policies that did not require vaccination, Defendants cannot show that denying Plaintiffs' religious accommodation requests furthers any legitimate interest.

91.     Defendants' acts were neither narrowly tailored nor the least restrictive means of achieving an otherwise permissible government interest, which could have been achieved by other protective measures that did not violate Plaintiffs' sincerely held religious beliefs, such as testing, masking, and physical distancing.

92.     Defendants have deprived Plaintiffs of their First Amendment rights under color of state law.

93.     Defendants' actions have caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Plaintiffs. Plaintiffs' have no adequate remedy at law to prevent the continuing violation of his constitutional and statutory liberties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Defendants and award the following relief to Plaintiffs:

A.     All equitable and legal relief available against the Symphony and the DNCR under Title VII, including but not limited to back pay, front pay, actual damages, compensatory damages,

consequential damages, punitive damages, pre-judgment interest, and reinstatement of Plaintiffs' employment;

B.     All equitable and legal relief available against the Symphony and Ms. Macdonald under § 1983, including but not limited to nominal damages, actual damages, compensatory damages, consequential damages, punitive damages, pre-judgment interest, and injunctive relief in the form of reinstatement of Plaintiffs' employment;

C.     Attorney's fees and costs against Defendants under 42 U.S.C. § 1988; and

D.     All other relief that this Court deems proper and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury be held on all issues so triable.

Respectfully submitted, this the 31st day of August, 2023

By:     */s/ James R. Lawrence, III*
James R. Lawrence, III
NC State Bar No. 44,560
ENVISAGE LAW
2601 Oberlin Road, Suite 100
Raleigh, NC 27607
Telephone: (919) 854-1844
Facsimile: (919) 854-2084
Email: jlawrence@envisage.law

Josh Dixon
N.C. State Bar No. 30604
CENTER FOR AMERICAN LIBERTY
1311 Main Street, Suite 207
Mount Airy, MD 21770
Telephone: (703) 687-6200
Email: jdixon@libertycenter.org

*Attorneys for Plaintiffs*