## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## Case No: 5:23-cv-00489-D-BM

CHRISTOPHER CAUDILL; RACHEL NIKETOPOULOS; and DAVID FRIEDLANDER, A/K/A DOVID FRIEDLANDER,

       Plaintiffs,

   v.

THE NORTH CAROLINA SYMPHONY SOCIETY, INC.; THE NORTH CAROLINA DEPARTMENT OF NATURAL AND CULTURAL RESOURCES; and SANDI MACDONALD,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**MEMORANDUM OF LAW IN SUPPORT OF THE NORTH CAROLINA SYMPHONY SOCIETY, INC. AND SANDI MACDONALD'S MOTION TO DISMISS**

(Fed. R. Civ. P. 12(b)(6))

Defendants The North Carolina Symphony Society, Inc. (the "Symphony") and Sandi Macdonald submit this memorandum of law in support of their motion to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## NATURE OF THE CASE

Plaintiffs claim that the Symphony is liable for discrimination based on religion under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"). Plaintiffs also claim that the Symphony and Macdonald are liable for violating the Free Exercise Clause of the First Amendment to the United States Constitution under 42 U.S.C. § 1983 ("Section 1983"). Plaintiffs' claims depend on their allegations that the Symphony, through Macdonald, denied Plaintiffs' requests for religious accommodations exempting them from the Symphony's COVID-19 vaccination policy and terminated Plaintiffs' employment based on their continued failure to

comply with that policy. As explained below, however, Plaintiffs' Title VII claim is time-barred because they failed to timely file charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and are not entitled to equitable tolling or estoppel. Likewise, Plaintiffs' Section 1983 claim fails because they do not plausibly allege that the challenged employment actions are fairly attributable to the State of North Carolina. Accordingly, Plaintiffs' claims should be dismissed.

## **PROCEDURAL HISTORY**

On August 31, 2023, Plaintiffs filed their Complaint [D.E. 1 ("Compl.")] and commenced this action. On September 12, 2023, the Symphony and Macdonald moved for an extension of time to answer or respond, which was granted [D.E. 6, 13]. On October 24, 2023, the Symphony and Macdonald moved for a second extension of time to answer or respond, which was granted [D.E. 16, 18]. The Symphony and Macdonald now move to dismiss the claims asserted in the Complaint.

## **FACTS ALLEGED IN THE COMPLAINT** [1]

The Symphony is a North Carolina non-profit corporation that was established in 1933. (Compl. ¶ 9; *see also* Exhibit 1 (the Symphony's Articles of Incorporation).) The Symphony is governed by a board of trustees composed of at least 16 members. (Compl. ¶ 18; N.C. Gen. Stat. § 143B-94 (providing that the "governing body" of the Symphony "shall be a board of trustees consisting of not less than 16 members").) North Carolina's Governor and Superintendent of Public Instruction are *ex officio* members of the board, and the Governor appoints four other trustees. (Compl. ¶ 18; N.C. Gen. Stat. § 143B-94.) The remaining ten or more trustees are

---

[1] For purposes of this motion, the Symphony and Macdonald recite the facts as they are alleged in Plaintiffs' Complaint and the documents referenced and incorporated therein, but do not admit any of Plaintiffs' allegations and reserve the right to deny them in a subsequent responsive pleading, if necessary.

appointed by the Symphony. N.C. Gen. Stat. § 143B-94. Sandi Macdonald serves as the Symphony's President and Chief Executive Officer. (Compl. ¶¶ 1, 11.) The Symphony has qualified as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code. (*Id.* ¶ 21 n.8 (citing and linking to the Symphony's 2021 Form 990 filing (attached as Exhibit 2)); Ex. 2 at 1, item I (identifying the Symphony as a 501(c)(3) tax-exempt organization).)

The Complaint alleges the Symphony has a "close affiliation" with the State of North Carolina, pointing to statutory provisions stating that the North Carolina Department of Natural Resources ("DNCR") is "organized to include" various entities, including the Symphony, and stating that the Symphony operates "under the patronage of the State." (Compl. ¶¶ 16, 21.) The Symphony receives significant State funding; in recent years State funding has covered approximately one third of the Symphony's budget. (*Id.* ¶ 21.) Additionally, Plaintiffs point to information about the Symphony on the DNCR's website, including the fact that Macdonald is listed on a DNCR page titled "Leadership" and that the DNCR's website includes a link to the Symphony's website. (*Id*. ¶¶ 17, 20.)

Plaintiffs allege they were musicians with the Symphony who won their positions through competitive auditions in 2003, 2005, and 2008, (*id.* ¶¶ 30–34), and that they are former employees of "the Symphony and/or the DNCR" (*id.* ¶¶ 6–8). As musicians with the Symphony, at least two of the Plaintiffs (Caudill and Niketopoulos) were members of a labor union that represents the Symphony's musicians. (*Id.* ¶ 43.)

In August 2021, the Symphony and the musicians' labor union announced a policy requiring that Symphony musicians be vaccinated against COVID-19 unless they received a medical or religious exemption. (*Id.* ¶ 42.) Plaintiffs each sought religious accommodations exempting them from the vaccination requirement under the procedure outlined in the policy. (*Id.*

¶ 46.) They allege that on September 14, 2021, Macdonald "preliminarily denied" their accommodation requests. (*Id.* ¶¶ 2, 49–52, 59.) Yet the letters denying Plaintiffs' accommodation requests, which are quoted at length in the Complaint, do not support this "preliminary" characterization. (*Id.* ¶¶ 49–50; *see also* Exhibits 3–5 (denial letters).) Instead, they state that the requested accommodation "cannot be granted" and explain that given the Symphony's "full schedule of in-person performances for the 2021-22 season," which would require Plaintiffs to perform "in close proximity and in close collaboration with [their] colleagues during performances and rehearsals," it would be "impossible to maintain the social distancing that would be required under applicable CDC guidance for an unvaccinated person in these settings, onstage, backstage and on buses when we travel the state to deliver our mission." (Ex. 3–5 (third paragraph).) The letters further elaborate that allowing Plaintiffs to work in close proximity with other Symphony members without being vaccinated would "endanger the health and safety of other members of the orchestra, other associated workers, and potentially members of the audience" and that "[t]he significant risk to the health and safety of these individuals that would be presented by an unvaccinated orchestra member creates an undue hardship for the North Carolina Symphony and requires that we deny your request." (*Id.*)

Having denied Plaintiffs' requested accommodations, the letters go on to explain that if Plaintiffs failed to comply with the vaccination policy, the Symphony would follow its agreement with the musicians' union and Plaintiffs would be "placed on unpaid leave with health benefits for the 2021-2022 season effective September 20, 2021." (*Id.* (fourth paragraph).)

Plaintiffs allege that Macdonald "promised that she would re-evaluate Plaintiffs' status and meet with them by April 1, 2022, to discuss whether the Symphony could accommodate them after that time." (Compl. ¶ 51.) Plaintiffs also allege that "[b]ased on this promise, Plaintiffs hoped the

Symphony might revisit its position" and "[r]easonably relying on the Symphony's promise of an open dialogue, and with the hope that a resolution could be reached before or at the April 1 meeting, Plaintiffs elected not to file a charge with the [EEOC] at that time." (*Id.*) But the letters say nothing about an April 1, 2022 meeting or planned future discussion with Plaintiffs. To the contrary, they establish an April 1, 2022 deadline for Plaintiffs to report compliance with the policy, stating "[i]f by April 1, 2022, you have not informed us that you have received full vaccination (as described in our policy at that time), your status will be reviewed and discussed in light of the then current policy to determine your long-term status with North Carolina Symphony." (Ex. 3–5 (paragraph 5).)

That deadline came and went, and on May 17, 2022, Macdonald informed Plaintiffs that given their failure to meet the April 1st deadline, notwithstanding a December 1, 2021 reminder of that deadline, and their ongoing failure to report compliance with the vaccination policy, their employment with the Symphony would end once their leaves of absence expired on June 30, 2022. (Compl. ¶ 60; Exhibits 6–8 (termination letters, third paragraph).)

Plaintiffs elected not to file charges of discrimination with the EEOC during the 180 days after their accommodation requests were denied, ultimately waiting eleven to thirteen months (specifically, 339 days (Niketopoulos), 370 days (Caudill), and 403 days (Friedlander)) to challenge those decisions. (*Id.* ¶ 61; *see also* Exhibits 9–11 (Plaintiffs' charges).) Notably, none of the charges suggest that the Symphony's accommodation decisions were "preliminary." (*See generally* Ex. 9–11.)

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests a complaint's legal and factual sufficiency. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–

63 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation omitted); *see also Twombly*, 550 U.S. at 570; *Giarratano*, 521 F.3d at 302.

In considering the motion, courts construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) (quotation omitted). But courts need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano*, 521 F.3d at 302 (quotation omitted); *see Iqbal*, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [plaintiff's] claims," *Twombly*, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." *Iqbal*, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011); *see* Fed. R. Civ. P. 10(c); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). A court may also consider a document submitted by a moving party, treating it as if it were attached to the complaint, if it is "integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166. Additionally, a court may take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment. *See, e.g.*, Fed. R. Evid. 201; *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Importantly, "in the event of conflict between the bare allegations of the complaint and any

exhibit attached . . ., the exhibit prevails." *Goines*, 822 F.3d at 166 (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

## ARGUMENT

The Complaint asserts two claims, each of which should be dismissed. First, despite Plaintiffs' efforts to plead around Title VII's 180-day charge-filing requirement, Plaintiffs' Title VII claim is time-barred because they waited 339 days (Niketopoulos), 370 days (Caudill), and 403 days (Friedlander) to challenge the denial of their requested accommodations. Second, Plaintiffs' Section 1983 claim fails because they do not plausibly allege that the Symphony's denial of their requested accommodations and termination of their employment are fairly attributable to the State of North Carolina. Accordingly, Plaintiffs' claims should be dismissed.

**I.     Plaintiffs' Title VII claim is time-barred.**

**A.     Plaintiffs failed to file their charges of discrimination with the EEOC within 180 days following the denial of their accommodation requests.**

Under Title VII, a charge "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "This rule protects defendants from having to defend against stale claims." *Schulze v. Meritor Auto.*, 163 F. Supp. 2d 599, 612 (W.D.N.C. 2000) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256–57 (1980)); *see also E.E.O.C. v. Randstad*, 685 F.3d 433, 444 (4th Cir. 2012). An untimely charge of discrimination is a basis for dismissal under Rule 12(b)(6), and North Carolina district courts do not hesitate to dismiss complaints on this basis. *See, e.g., Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 543 (E.D.N.C. 2008) (dismissing Title VII and ADEA claims); *Oldham v. Univ. of N. Carolina*, No. 1:22CV513, 2023 WL 3984031, at *7 (M.D.N.C. June 13, 2023) (unpublished) (dismissing Title VII claims); *Rojea v. Cregger*, No. 3:19-CV-619-RJC-DCK, 2021 WL 1233461,

at *3 (W.D.N.C. Apr. 1, 2021) (unpublished) (dismissing Title VII and ADEA claims), *aff'd*, 858 F. App'x 655 (4th Cir. 2021) (unpublished).

Under Title VII, the limitations period begins on the day the employee receives notice of the allegedly discriminatory act even though the effects of that act may not fully manifest until later. *Ricks*, 449 U.S. at 258 ("[t]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful") (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209 (9th Cir. 1979)). In *Ricks*, the plaintiff was denied academic tenure and given a one-year terminal contract. *Id.* at 253. While the plaintiff argued discrimination motivated his employer to deny him tenure and terminate his employment, the Court rejected the argument that the limitations period only began running once his employment ended, stating "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination," and "[i]f [the plaintiff] intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." *Id.* at 257. The termination of employment was a "delayed, but inevitable, consequence of the denial of tenure," and thus the limitations period commenced when the tenure decision was made and communicated to the plaintiff. *Id.* at 257–58.

Here, the Symphony denied Plaintiffs' requests for accommodation from the Symphony's COVID-19 vaccination policy on September 14, 2021, and placed Plaintiffs on unpaid leave with health benefits for the 2021-2022 season, as the vaccination policy negotiated between the Symphony and the musicians' labor union required. (Compl. ¶ 51; Ex. 6–8 (second paragraph).) On May 17, 2022, the Symphony informed Plaintiffs that based on their continued failure to

comply with the COVID-19 vaccination policy, their employment would be terminated when their leaves of absence expired.

Despite Plaintiffs' allegations that both the denial of their requested religious accommodation and the termination of their employment violated Title VII, like the plaintiff in *Ricks*, they do not allege any discriminatory acts that continued until, or occurred at the time of, the actual termination of their employment. In other words, setting aside the accommodation decisions, Plaintiffs have not pleaded any facts suggesting that the Symphony terminated their employment based on their religious beliefs. To the contrary, their ***own allegations*** indicate that they were terminated based on their continued failure to comply with Symphony policy—the same policy that they asked to be exempted from as a religious accommodation. (Compl. ¶¶ 2 (alleging the Symphony "terminated their employment for failing to take the vaccine"), 75 (alleging that Plaintiffs' employment was terminated "because they failed to comply with the vaccine mandate and because they requested a religious accommodation from it").) Moreover, Plaintiffs have not alleged that any similarly situated musician was retained after failing to comply with that policy.

Plaintiffs' terminations were a delayed consequence of the denial of their accommodation requests and their continued failure to comply with Symphony policy. Therefore, the only alleged discriminatory act—denial of their accommodation requests—occurred on September 14, 2021, and the continuation of their employment on unpaid leave did not prolong the 180-day deadline to file charges with the EEOC. Plaintiffs, however, waited 339 to 403 days after the denial of their accommodation requests before filing charges of discrimination. (Compl. ¶ 61; Ex. 9–11.) Thus, Plaintiffs' charges were untimely.

In an attempt to avoid this result, Plaintiffs allege that the September 14, 2021 denials were only "preliminary." (Compl. ¶ 49.) As an initial matter, there is nothing "preliminary" about being

denied exemptions and placed on unpaid leave for the full 2021-2022 season. Moreover, once a decision is made, even a professed willingness to reconsider does not make that decision "preliminary" or "tentative." *See Ricks*, 449 U.S. at 261 (concluding that although the defendant indicated a willingness to change its prior decision depending on the outcome of the plaintiff's grievance, entertaining a grievance does not suggest that the earlier decision was tentative because the grievance procedure is a remedy for a prior decision); *Mezu v. Morgan State Univ.*, 367 F. App'x 385, 388 (4th Cir. 2010) (unpublished) (stating that the pendency of an internal appeal and possibility of a reversal of the initial decision did not alter when the limitations period commenced); *Belton v. City of Charlotte*, 175 F. App'x 641, 654 (4th Cir. 2006) (unpublished) (rejecting plaintiffs' argument that defendant's decision was a provisional recommendation and noting that "the existence of a grievance procedure 'should not obscure the principle that limitations periods normally commence when the employer's decision is made'" (quoting *Ricks*, 449 U.S. at 261)).

Regardless, nothing in the letters denying Plaintiffs' accommodation requests suggests that denial was "preliminary." To the contrary, the letters stated "your request cannot be granted" and informed Plaintiffs that they would be placed on unpaid leave for the 2021-2022 season effective September 20, 2021. (Ex. 3–5.) Moreover, the letters did not promise an April 1, 2022 meeting or any future discussion with Plaintiffs. (*Id.*) In fact, the September 14 denial letters put the burden on Plaintiffs to inform the Symphony that they had been fully vaccinated by April 1, 2022, and said that if they did not, their employment status would be "reviewed and discussed." (*Id.*) While Plaintiffs characterize those letters as promising an April 1, 2022 meeting and discussion with Plaintiffs (as opposed to discussion of their employment status within Symphony management),

the letters simply do not support that characterization.[2] (Ex. 3–5.) Of course, the denial letters themselves prevail where Plaintiffs' allegations conflict with them. *Goines*, 822 F.3d at 166.

Tellingly, Plaintiffs' charges of discrimination also did not characterize the denial of their accommodation requests as "preliminary." (*See* Ex. 9 ("I requested a religious exemption to [the Symphony's] Covid-19 vaccination mandate, which was denied."); Ex. 10 ("On September 14, 2021, I got a letter . . . that said I did not submit enough information on my vaccine religious exemption paperwork and there are no reasonable accommodations available . . . [and] I was placed on unpaid leave."); Ex. 11 ("My exemption request was denied in September 2021, and I was forced to take unpaid leave for one year.").) Instead, Plaintiffs' charges of discrimination describe the denial of their accommodation requests and their placement on unpaid leave as final decisions.

Even assuming Macdonald promised to discuss Plaintiffs' employment status with them by April 1, which is not reflected anywhere in the September 14 denial letters (*see* Ex. 3–5), it stands to reason that such a discussion would have related only to Plaintiffs' vaccination status as it concerned their future employment, and would not have involved a reconsideration of their accommodation requests that had been denied in September 2021 and resulted in Plaintiffs being placed on unpaid leave for the entirety of the 2021-2022 season. Finally, even if Plaintiffs' unsupported interpretation—that the September 14 denial letters included a promise by Macdonald to meet with them by April 1, 2022, more than six months after the denial decision, to discuss the denial of their accommodation requests—were valid, a willingness to re-evaluate or revisit a decision that has already been made does not make the prior decision preliminary. That is especially apparent because Plaintiffs began experiencing the effects of that denial, including being

---

[2] Plaintiffs do not allege that Macdonald had any communication with them about the denial of their requests apart from the September 14, 2021 letters, which Plaintiffs quote and summarize at length in discussing that denial. (Compl. ¶¶ 49–50.)

placed on unpaid leave and not performing with the Symphony, the same month the denial occurred. Thus, Plaintiffs failed to timely file their charges of discrimination with the EEOC.

### B. Plaintiffs do not allege facts that would show the Symphony engaged in wrongful conduct that prevented the Plaintiffs from timely filing their charges of discrimination.

Filing a timely charge of discrimination with the EEOC "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). "Courts may evaluate whether it would be proper to apply such doctrines, although they are to be applied sparingly." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Here, Plaintiffs do not allege any facts to suggest that that the Symphony waived the limitations period. Further, Plaintiffs are not entitled to equitable tolling or estoppel.

Equitable tolling is a "narrow limitations exception" that only applies when "the employer 'wrongfully deceived or misled the plaintiff in order to conceal the existence of the cause of action.'" *Olson v. Mobil Oil Corp.*, 904 F.2d 198, 201 (4th Cir. 1990) (quoting *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987)). "[T]he pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations periods." *Ricks*, 449 U.S. at 261.

Here, Plaintiffs do not allege or provide any facts in their Complaint to suggest the Symphony wrongfully deceived or misled them to conceal the existence of the cause of action. To the extent that Plaintiffs argue they are entitled to equitable tolling based on their unfounded allegation that the September 14, 2021 letters included a promise by Macdonald to re-evaluate the denial of their accommodation requests, the possibility of a future review of an employment decision does not toll the limitations period. *Id.* Thus, Plaintiffs are not entitled to equitable tolling.

Plaintiffs also allege that the Symphony "should be equitably estopped from denying that Plaintiffs exhausted their administrative remedies." (Compl. ¶ 78.) However, equitable estoppel only applies where "the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline." *English*, 828 F.2d at 1049 (citing *Felty v. Graves-Humphreys*, 818 F.2d 1126 (4th Cir. 1987); *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982)). The limitations period will not be tolled unless an employee's failure to timely file "is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Id.* (quoting *Price*, 694 F.2d at 965). In *Belton*, the Fourth Circuit explained that active steps by an employer would include, for example, promising not to plead the statute of limitations, but would not include promising to investigate and failing to update the plaintiffs on the progress of the investigation. 175 F. App'x at 654. There, the court noted that "plaintiffs' hope that the internal process would remedy the problem is not the type of situation that equitable estoppel is designed to address." *Id.*; *see also Muir v. Winston-Salem State Univ.*, No. 1:11-CV-282, 2012 WL 683359, at *6 (M.D.N.C. Mar. 2, 2012) (unpublished) ("'An employee's hope for rehire,' for example, does not warrant the application of equitable doctrines 'absent some employer conduct likely to mislead an employee into sleeping on his rights.'" (quoting *Price*, 694 F.2d at 965–66)).

Here, Plaintiffs allege that they "hoped the Symphony might revisit its position" and "[r]easonably relying on the Symphony's promise of an open dialogue, and with the hope that a resolution could be reached before or at the April 1 meeting, Plaintiffs elected not to file a charge with the [EEOC] at that time." (Compl. ¶ 51.) Plaintiffs also allege that "as the April 1 meeting date approached, Plaintiffs continued to hope that Defendants would revisit their position. But Ms. Macdonald never scheduled the promised meeting." (*Id.* ¶ 60.) Again, to the extent Plaintiffs'

allegations are based on the September 14, 2021 denial letters—and they have not alleged any separate communication with Macdonald—those letters do not promise an April 1 meeting, forecast a discussion with Plaintiffs about the denial decisions, or indicate any willingness to revisit the denial decisions. (*See* Ex. 3–5.) Again, where Plaintiffs' bare allegations conflict with the denial letters, the letters themselves prevail. *Goines*, 822 F.3d at 166.

Still, even assuming Macdonald separately promised to have an open dialogue, re-evaluate the prior decision to deny Plaintiffs' accommodation requests, and meet with Plaintiffs by April 1, a failure to re-evaluate and meet by April 1 is akin to the promise and failure to update plaintiffs made in *Belton*, which the Fourth Circuit said was not the type of situation that equitable estoppel was designed to address. 175 F. App'x at 654. Likewise, the Plaintiffs' hopes that the Symphony would revisit its position and that a resolution could be reached does not warrant application of equitable doctrines absent conduct by the Symphony designed to mislead them. Plaintiffs do not allege any facts showing a deliberate design by the Symphony or actions that the Symphony should unmistakably have understood would cause Plaintiffs to delay filing their charges of discrimination. The September 14, 2021 denial letters are clear that a final decision had been made, and Plaintiffs admit that they simply "elected not to file" their charges of discrimination at that time. (Compl. ¶ 51.) Recognizing the untimeliness of their charges, Plaintiffs now allege that their unfounded "hope" that the Symphony would reverse course is enough to justify equitable estoppel. It is not and thus Plaintiffs are not entitled to equitable estoppel.

Because Plaintiffs failed to timely file their charges of discrimination with the EEOC and neither equitable tolling nor equitable estoppel apply here, Plaintiffs' Title VII claim is time-barred. Moreover, Plaintiffs' failure to timely challenge the accommodation decisions also decisively undercuts their claim that their subsequent discharge, which flowed directly from the

accommodation decision, resulted from religious discrimination. Accordingly, Plaintiffs' Title VII claim should be dismissed in their entirety.

## II. Plaintiffs' Section 1983 claim should be dismissed because they fail to plausibly allege that the challenged actions—denial of their requested accommodations and termination of their employment—are fairly attributable to the State of North Carolina.

Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. To state a claim under Section 1983, Plaintiffs "must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *see also Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011); *Philips*, 572 F.3d at 180; *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Dowe v. Total Action Against Poverty,* 145 F.3d 653, 658 (4th Cir. 1998).

Courts treat the "under color of state law" inquiry under Section 1983 as equivalent to the "state action" inquiry under the Fourteenth Amendment, and often use those terms interchangeably. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *United States v. Price*, 383 U.S. 787, 794, n.7 (1966))); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 341 (4th Cir. 2000) ("In cases construing section 1983, 'under color' of law has been treated consistently as equivalent to the 'state action' requirement under the Fourteenth Amendment." (quoting *Haavistola v. Community Fire Co. of Rising Sun, Inc.,* 6 F.3d 211, 215 (4th Cir.1993))).

"Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" *Am. Mfrs.*, 526 U.S. at 50 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982) (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13 (1948))); *see also Cox v. Duke Energy Inc.*, 876 F.3d 625, 632 (4th Cir. 2017). "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). Accordingly, private action "will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action," and a state's "mere approval of or acquiescence in the initiatives of a private party is insufficient." *Wahi*, 562 F.3d at 616 (cleaned up).

"The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker*, 457 U.S. at 838 (1982) (quoting *Lugar*, 457 U.S. at 937); *Cox*, 876 F.3d at 633. "[T]o be sued under § 1983, a defendant 'must either be a state actor or have a sufficiently close relationship with state actors such that a court would conclude that [it] is engaged in the state's actions.'" *Cox*, 876 F.3d at 632 (quoting *DeBauche v. Trani*, 191 F.3d 499, 506 (4th Cir. 1999)). The "fairly attributable" standard maintains Section 1983 as "a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another." *Philips*, 572 F.3d at 181 (quoting *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006)).

A corporation can be considered part of the government and thus a state actor for all purposes if the government "create[d] a corporation by special law, for the furtherance of governmental objectives, and retain[ed] for itself permanent authority to appoint a majority of the

directors of that corporation." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) (holding that Amtrak was part of the government for First Amendment purposes); *see also White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 191 & n.4 (4th Cir. 2022).

When assessing whether a private party or entity acted under color of state law, the inquiry focuses on the alleged deprivation of rights, and "begins by identifying 'the specific conduct of which the plaintiff complains.'" *Am. Mfrs.*, 526 U.S. at 51 (quoting *Blum,* 457 U.S. at 1004); *see also Blum*, 457 U.S. at 1003 ("Faithful adherence to the 'state action' requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint."); *Mentavlos v. Anderson*, 249 F.3d 301, 311 (2001); *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 120 (4th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2657 (2023); *Philips*, 572 F.3d at 181. A plaintiff must allege, and ultimately prove, that the specific deprivation at issue occurred under color of state law. "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Here, Plaintiffs' allegations establish that the Symphony is a private, non-profit corporation. Among other things, Plaintiffs acknowledge that:

- The Symphony is a North Carolina non-profit corporation that was established in 1933. (Compl. ¶ 9; *see also* Ex. 1[3].)

- The Symphony is governed by a board of trustees, the majority of whom (10 out of 16 or more) are appointed by the Symphony. (Compl. ¶ 18; N.C. Gen. Stat. § 143B-94.) Thus,

---

[3] The Court may take judicial notice of the Symphony's Articles of Incorporation, which are a matter of public record. Fed. R. Evid. 201; *Tellabs, Inc.*, 551 U.S. at 322; *Philips*, 572 F.3d at 180.

the State controls only 6 out of the 16 or more board seats, and the Symphony is free to expand the board, further diluting the State's minority position. Notably, the Symphony's 2021 Form 990 filing cited in Plaintiffs' Complaint shows that it actually has 55 trustees. (Ex. 2 at 1 (item K, lines 3–4), 7–10 (listing trustees).)

- The Symphony has qualified as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code. (Compl. ¶ 21 n.8 (citing and linking to the Symphony's 2021 Form 990 filing with the Internal Revenue Service (Ex. 2)).)

- The Symphony's musicians are represented by a labor union that collectively bargains with the Symphony. (Compl. ¶¶ 42–43; Ex. 11 (stating that "[e]ach musician in the orchestra signs a contract every January that is negotiated between an elected Orchestra Committee, the local musician's union, and the management of the NCSO"); Ex. 3–5 (identifying the "mandatory COVID-19 Vaccination Policy for Musicians that was agreed to by the North Carolina Symphony Players' Association" and the Symphony and referring to the "Master Contract between Professional Musicians' Association Local 500, American Federation of Musicians"); Ex. 6–8 (identifying the "COVID-19 Vaccination Policy for Musicians" as part of the "Master Contract"). Yet North Carolina law prohibits any state agency, instrumentality, or institution from entering into a collective bargaining agreement. N.C. Gen. Stat. § 95-98.

Accordingly, the question is whether Plaintiffs have alleged that the Symphony, a private, non-profit corporation, nevertheless acted under color of state law in denying their accommodation requests and terminating their employment.

**A.** **Plaintiffs do not allege facts that would show that the Symphony is a government-created and government-controlled corporation under *Lebron*.**

Plaintiffs have not alleged any facts showing that the Symphony is part of the State under the *Lebron* test. They do not allege that the State created the Symphony by special law, but instead acknowledge that it was created in 1933, a decade before the first alleged legislative action concerning the Symphony. (Compl. ¶¶ 9, 15; Ex. 1.) Nor do they allege the Symphony was created by the government to further a government objective. And far from alleging that the Symphony is controlled by the State, Plaintiffs concede that only 6 of its 16 (or more) trustees are appointed by or drawn from the State. (Compl. ¶ 18; N.C. Gen. Stat. § 143B-94.) In short, Plaintiffs' allegations do not establish any of the three *Lebron* elements, and thus the Symphony cannot be considered part of State government. *See Philips*, 572 F.3d at 186 (concluding *Lebron* test was not met because entity was "not created by special law" but "under the general nonprofit incorporation statutes"); *White Coat Waste Project*, 35 F.4th at 193 & n.4 (holding that "the *Lebron* test is only satisfied where the government creates a corporation under specific legal authority"); *see also S. Env't Law Ctr. v. N.C. R.R. Co.*, 378 N.C. 202, 203–05, 861 S.E.2d 533, 534–36 (N.C. 2021) (holding that the North Carolina Railroad Company, a private corporation established in 1849, was not a State agency or subdivision of State government subject to the Public Records Act even though the State was its sole shareholder and appointed its entire board of directors).

**B.** **Plaintiffs do not allege any facts suggesting a nexus between the actions they challenge and any State involvement, influence, or control.**

Plaintiffs also fail to allege that the Symphony's challenged actions—the denial of their requested accommodations, which were to be exempted from the Symphony's vaccine requirement, and the termination of their employment for failing to comply with that requirement—are "fairly attributable to the State." *Mentavlos*, 249 F.3d at 311; *Philips*, 572 F.3d

at 181–82. The Complaint does not plead any facts suggesting that the Symphony's vaccine policy, the denial of Plaintiffs' requested accommodations, or the termination of Plaintiffs' employment was determined or even influenced by the State or any state law. To the contrary, Plaintiffs allege that the vaccine requirement was put in place by the Symphony and the musicians' labor union; that their requested accommodations were denied by Macdonald and the Symphony; and that their employment was terminated by Macdonald. (Compl. ¶¶ 42–43, 49–52, 60.) None of their allegations suggest that the challenged decisions by Macdonald and the Symphony involved the State in any way, shape, or form, much less that the State "so dominated such activity as to convert it to state action." *Wahi*, 562 F.3d at 616 (quoting *DeBauche*, 191 F.3d at 507). This utter failure dooms Plaintiffs' Section 1983 claim.

Having failed to allege any nexus between the challenged actions and the State, Plaintiffs instead rely on generalized allegations about the relationship between the Symphony and the State. The implication is that if Plaintiffs can show a close enough relationship, then the Symphony and Macdonald must be state actors for all purposes, and thus any action they took necessarily occurred under color of state law. That theory, however, runs headlong into contrary Supreme Court and Fourth Circuit precedent, which focuses not on the overall status of an ***actor***, but on whether the specific challenged ***actions*** occurred under color of state law. *Am. Mfrs.*, 526 U.S. at 51; *Peltier*, 37 F.4th at 120; *Philips*, 572 F.3d at 181; *Mentavlos*, 249 F.3d at 311.

Focusing on the challenged actions makes sense because individuals and private parties may and often do act under color of state law in some circumstances, but not in others. For example, a police officer may act under color of state law when on duty, in uniform, and bearing badge, handcuffs, and service weapon, but not when off duty, in civilian garb, and free of such

accoutrement. For this reason, courts have repeatedly held that generalized allegations linking a private entity and the government will not suffice.

For example, *Philips v. Pitt County Memorial Hospital* involved a non-profit corporation that purchased a public hospital from Pitt County, but remained subject to various obligations to the county, including limits on its ability to sell the real property or hospital, limits on its ability to delegate management of the hospital, requirements that it make certain payments, maintain specific programs, and comply with the North Carolina Open Meetings Law, and automatic reversion of the purchased assets if the non-profit failed to meet various standards. 572 F.3d at 178–79. Additionally, the non-profit was governed by a 20-member board of trustees appointed solely by government bodies—11 by Pitt County and the remaining 9 by the Board of Governors of the University of North Carolina. *Id.*

Despite these connections, the Fourth Circuit affirmed dismissal of the plaintiff physician's Section 1983 claims, which related to the suspension of his hospital privileges, because there were no allegations suggesting that Pitt County played any role in the suspension of those privileges. *Id.* at 183–184 (noting that "Dr. Philips' complaints nowhere allege that the appointing governmental entities played any role in the specific decision to terminate his privileges" and "there is no allegation of Pitt County's involvement in the decisions that led to Dr. Philip's alleged deprivations"); *see also Rendell-Baker*, 457 U.S. at 841, 843 (holding that plaintiffs failed to state a Section 1983 claim related to their discharges, which were not alleged to be compelled or influenced by the State, which took "relatively little interest in the school's personnel matters"); *DeBauche*, 191 F.3d at 509 (affirming dismissal of Section 1983 claim where there was no allegations that the challenged actions were motivated or controlled by the state).

In short, as in cases like *Philips, Rendell-Baker*, and *DeBauche*, Plaintiffs have not alleged any facts suggesting that the State of North Carolina determined or influenced the decisions they challenge. Accordingly, their Section 1983 claim should be dismissed for failure to state a claim.

### C. Plaintiffs' generalized allegations about the Symphony's connections with the State cannot establish a nexus between the challenged actions and the State.

Unable to establish a connection between the actions they complain about and the State, Plaintiffs instead cobble together various connections between the Symphony and the State. Again, the common denominator among these connections is that none of them suggest that the State, any state actor, or any state law played any role in the Symphony's adoption of a vaccine policy, denial of Plaintiffs' requests for an exemption from the vaccine requirement, or termination of Plaintiffs' employment. Moreover, many of the connections are more attenuated than advertised.

First, Plaintiffs' allegations about state legislation related to the Symphony show the State's interest in and support of the Symphony, but do not suggest that it is a part of state government or meaningfully controlled or constrained by the State. (Compl. ¶¶ 15–16, 18–19, 21.) While there are statutory provisions enacted long after the Symphony was created that indicate that the State provides patronage and support for the Symphony, and that the DNCR was "organized to include" the Symphony,[4] that does not mean that the Symphony, much less its internal employment decisionmaking, is controlled by the State. To the contrary, as Plaintiffs admit, the Symphony is a 501(c)(3) non-profit corporation that is governed by a board of trustees that the State does not control. (Compl. ¶¶ 9 & Ex. 1, 18 (citing N.C. Gen. Stat. § 143B-94), 21 n.8.)

---

[4] The Complaint subtly mischaracterizes the 1973 Executive Organization Act. The Symphony was not "organized under the DNCR"; instead, the DNCR was "organized to include" the Symphony, which was then forty years old. N.C. Gen. Stat. § 143B-53. Similarly, the functions vested with the DNCR were not all functions of the Symphony, but only certain "executive functions of the State" that had previously been vested by statute with other state agencies. N.C. Gen. Stat. § 143B-51.

Second, Plaintiffs' allegations about employment matters do not show that the Symphony is a state actor or that it acts under color of state law. The Complaint points to the fact that Macdonald is listed on a DNCR page titled "Leadership" that identifies the leaders of the various entities the DNCR was initially organized to include. (Compl. ¶ 20 & n.6.) Yet that page, which is attached as Exhibit 12, identifies Macdonald not as a state employee, but as "President & Chief Executive Officer" of the North Carolina Symphony, which is a non-profit corporation.

Furthermore, while the Complaint alleges that the DNCR website identifies six DNCR employees in administrative roles related to the Symphony (Compl. ¶ 20 & n.7), that suggests only the truth—those DNCR employees assist the Symphony as part of the DNCR's support for the Symphony. As an article Plaintiffs cite and quote (Compl. ¶ 15 n.1 (attached as Exhibit 13)) explains, the State funds "eight administrative positions" for the Symphony. (Ex. 13 at 88, 89 (Symphony organizational chart identifying those eight positions, but not the remaining Symphony staff, as DNCR employees).) Indeed, the fact that the DNCR's website lists *only* those six employees indicates that everyone else who works with the Symphony—including Macdonald, the Symphony's senior management, and the Symphony's musicians—are not DNCR employees.

Similarly, Plaintiffs misread N.C. Gen. Stat. § 126-5(c11)(2) in contending that it provides that "employees of the Symphony are considered State employees." (Compl. ¶ 23.) That provision never mentions "employees of the Symphony." Instead, it provides that certain State employees, including certain DNCR employees, are exempt from specific provisions of the North Carolina Human Resources Act:

> The following are exempt from (i) the classification and compensation rules established by the State Human Resources Commission pursuant to G.S. 126-4(1) through (4); (ii) G.S. 126-4(5) only as it applies to hours and days of work, vacation, and sick leave; (iii) G.S. 126-4(6) only as it applies to promotion and transfer; (iv) G.S. 126-4(10) only as it applies to the prohibition of the establishment of incentive

pay programs; and (v) Article 2 of Chapter 126 of the General Statutes, except for G.S. 126-7.1:

. . .

(2) The following employees of the Department of Natural and Cultural Resources:

    . . .

    d. North Carolina Symphony.

N.C. Gen. Stat. § 126-5(c11). By its terms, subsection (c11)(2) applies only to ***DNCR employees***, and subsection (c11)(2)(d) thus applies only to the ***DNCR employees*** (namely, the six Plaintiffs identify) who work in administrative roles with the Symphony. Plaintiffs' allegation, which is premised solely on the statute, finds no support there.

Third, Plaintiffs' allegations about state support of the Symphony do not show that it is a state actor or acts under color of state law. It is well-established law that government financial support does not turn a private entity into a state actor. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931–32 (2019); *Rendell-Baker*, 457 U.S. at 840; *Blum*, 457 U.S. at 1011; *Dowe*, 145 F.3d at 659. In *Rendell-Baker*, the Supreme Court held that a school's receipt of state funds did not mean that its decision to discharge certain employees occurred under color of state law. 457 U.S. at 840 ("[T]he school's receipt of public funds does not make the discharge decisions acts of the State."). Even extensive state funding does not suffice. *Id.* (finding no state action even though the school received at least 90 percent of its operating budget from the state); *Blum*, 457 U.S. at 1011 (nursing homes did not act under color of state law even though the state subsidized the operating and capital costs of their facilities and paid the medical expenses of more than 90 percent of their patients). Consequently, the allegation that one third of the Symphony's funding comes from the State (far less than in *Blum* or *Rendell-Baker*) does not show that the Symphony is a state actor.

Fourth, the fact that the Symphony's budget is subject to the State Budget Act and oversight by the State Auditor may reflect state regulation of the Symphony, but it does not make the Symphony a state actor. "In cases involving extensive state regulation of private activity, we have consistently held that '[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment.'" *Am. Mfrs.*, 526 U.S. at 52 (quoting *Jackson,* 419 U.S. at 350); *see also Blum*, 457 U.S. at 1004; *Rendell-Baker*, 457 U.S. at 841; *Dowe*, 145 F.3d at 658–59. As the Supreme Court has recognized, "the 'being heavily regulated makes you a state actor' theory of state action is entirely circular and would significantly endanger individual liberty and private enterprise." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1932. "Put simply, being regulated by the State does not make one a state actor." *Id.* (citations omitted).

Again, as explained in Part II.B, there is no allegation that this limited regulation of the Symphony had any effect on the challenged employment actions. *See Am. Mfrs.*, 526 U.S. at 57–58 (extensive state regulation of workers' compensation insurers did not show that the challenged decisions occurred under color of state law because "the state statutory and regulatory scheme leaves the challenged decisions to the judgment of insurers"); *Rendell-Baker*, 457 U.S. at 841–42 (extensive state regulation of school did not show that challenged personnel decisions were made "under color of state law" where those decisions "were not compelled or even influenced by any state regulation"); *Blum*, 457 U.S. at 1008 (extensive state regulation of nursing homes did not show that patient discharge and transfer decisions occurred under color of state law where those decisions were based on medical judgments made by private parties).

At bottom, Plaintiffs have not pleaded enough to plausibly suggest that the challenged employment decisions by the Symphony constituted state action or were taken under color of state

law. Supreme Court and Fourth Circuit precedent make it clear that government connections, support, and regulation do not mean everything an entity does is "fairly attributable to the State." Plaintiffs have not alleged any facts suggesting that the employment decisions at issue were made under color of state law, and thus their Section 1983 claim should be dismissed.

## CONCLUSION

In sum, Plaintiffs' claims fail and should be dismissed under Rule 12(b)(6). First, Plaintiffs failed to timely file their charges of discrimination with the EEOC and are not entitled to equitable tolling or estoppel. Thus, Plaintiffs' Title VII claim is time-barred. Second, Plaintiffs do not plausibly allege that the challenged employment actions are fairly attributable to the State. Thus, Plaintiffs' Section 1983 claim also fails. Accordingly, the Symphony and Macdonald respectfully request that this Court grant their motion and dismiss the Complaint in its entirety for failure to state a claim.

This the 3rd day of November, 2023.

SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P.

By: /s/ Isaac A. Linnartz
Isaac A. Linnartz
N.C. State Bar No. 39858
ilinnartz@smithlaw.com
Shameka C. Rolla
N.C. State Bar No. 56584
srolla@smithlaw.com
Post Office Box 2611
Raleigh, North Carolina 27602-2611
Telephone: (919) 821-1220
Facsimile: (919) 821-6800
*Attorneys for Defendants The North Carolina Symphony Society, Inc. and Sandi Macdonald*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of Court using the CM/ECF System, which will send notification of such filing to all counsel and parties of record.

This the 3rd day of November, 2023.

SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.

By:    /s/ Isaac A. Linnartz
        Isaac A. Linnartz
        N.C. State Bar No. 39858
        ilinnartz@smithlaw.com
        Post Office Box 2611
        Raleigh, North Carolina 27602-2611
        Telephone: (919) 821-1220
        Facsimile: (919) 821-6800