IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:23-CV-489-D

|  |  |  |
|---|---|---|
| CHRISTOPHER ROBERT CAUDILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| NORTH CAROLINA SYMPHONY | ) | |
| SOCIETY, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

On August 31, 2023, Christopher Caudill ("Caudill"), Rachel Niketopoulos ("Niketopoulos"), and David "Dovid" Friedlander ("Friedlander") (collectively, "plaintiffs") filed this action against the North Carolina Symphony Society, Inc. ("Symphony"), the North Carolina Department of Natural and Cultural Resources ("NCDNCR"), and Sandi Macdonald in her official and individual capacities ("Macdonald") (collectively, "defendants") [D.E. 1]. On November 3, 2023, the NCDNCR moved to dismiss plaintiffs' complaint [D.E. 22] and filed a memorandum and exhibits in support [D.E. 23.]. See Fed. R. Civ. P. 12(b)(1), (2), (6). The same day, the Symphony and Macdonald moved to dismiss plaintiffs' complaint [D.E. 24] and filed a memorandum and exhibits in support [D.E. 25]. See Fed. R. Civ. P. 12(b)(6). On November 24, 2023, plaintiffs filed an amended complaint [D.E. 26], adding additional allegations and two more claims for relief. In plaintiffs' amended complaint, plaintiffs allege: (1) religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., against the NCDNCR and the Symphony, (2) failure to accommodate in violation of Title VII

against the NCDNCR and the Symphony, (3) retaliation in violation of Title VII against the NCDNCR and the Symphony, (4) a violation of the First Amendment of the United States Constitution's Free Exercise Clause under 42 U.S.C. § 1983 against the Symphony and Macdonald, in her official and individual capacities, (5) a violation of the Fourteenth Amendment of the United States Constitution's Equal Protection Clause under 42 U.S.C. § 1983 against the Symphony and Macdonald, in her official and individual capacities, and (6) wrongful discharge under North Carolina law against the Symphony and Macdonald, in her individual capacity. See [D.E. 26] ¶¶ 79–118. On November 29, 2023, plaintiffs filed exhibits [D.E. 28] in support of their amended complaint. On December 20, 2023, the NCDNCR moved to dismiss plaintiffs' amended complaint [D.E. 31] and filed a memorandum and exhibits in support [D.E. 32]. See Fed. R. Civ. P. 12(b)(1), (6). The same day, the Symphony and Macdonald moved to dismiss plaintiffs' amended complaint [D.E. 33] and filed a memorandum and exhibits in support [D.E. 34]. See Fed. R. Civ. P. 12(b)(6). On February 12, 2024, plaintiffs responded in opposition to defendants' motions to dismiss [D.E. 40]. On March 26, 2024, the Symphony and Macdonald replied [D.E. 45]. The same day, the NCDNCR replied [D.E. 46]. As explained below, the court dismisses as moot defendants' motions to dismiss the complaint, grants in part and denies in part NCDNCR's motion to dismiss the amended complaint, and grants in part and denies in part the Symphony and Macdonald's motion to dismiss the amended complaint.

I.

In 1932, the Symphony formed as a non-profit corporation in Wake County. See [D.E. 28-2] 2. On March 10, 1943, due to the Symphony's ongoing financial challenges, the North Carolina General Assembly ratified the Horn Tootin' Bill ("HTB"), S.B. 248, 1943 General Assemb., Reg.

Sess. (N.C. 1943), to provide state financial aid to the Symphony. See Am. Compl. [D.E. 26] ¶ 15; HTB § 7; [D.E. 28-1]; [D.E. 28-2] 2.

The HTB's introduction states: "An act to place the [Symphony], under the patronage and control of the State, and to authorize the governor and council of State to make an allotment from the contingency and emergency fund in aid thereof." HTB (cleaned up). The preamble section titled "Service of N.C. Symphony Society" states "the [Symphony] is an organization of citizens of this State interested in making fine music available to the people of the State and promoting interest and appreciation of fine music by the citizenship of the State." HTB Preamble. The preamble section titled "Non-profit organization" states that the Symphony "is a non-stock, non-profit organization organized by patriotic North Carolinians for the said purpose, and has functioned since one thousand nine hundred and thirty-two by giving two hundred concerts in twenty cities and communities." Id.

The preamble section titled "Purposes educational" states that "the plan and the purposes of the [Symphony] are distinctly educational, particular emphasis being made on increasing the love and appreciation of music by the children of the State, by giving free concerts for the children." Id. The preamble section titled "Patronage of State desired" states "it is desired by the members of said Society to place it under the patronage and control of the State, to the end that its permanency may be assured and that the State may to some extent lend financial aid necessary for the support thereof." Id.

Section one, titled "Membership of Board of Directors," states "that the governing body of the [Symphony], shall be a board of directors consisting of [16] members, of which the Governor of the State and the Superintendent of Public Instruction shall be ex officio members, and four other members shall be named by the Governor." Id. § 1. "The remaining ten directors shall be

3

chosen by the members of the [Symphony], in such manner and at such times as that body shall determine." Id.

Section two, titled "Terms of members appointed by Governor," states "[t]hat of the four members first named by the Governor, two shall be appointed for terms of two years each and two for terms of four years each, and subsequent appointments shall be made for terms of four years each." Id. § 2. Section three, titled "Adoption of by-laws," states "[t]hat the said board of directors, when organized under the terms of this Act, shall have authority to adopt bylaws for the [Symphony] and said bylaws shall thereafter be subject to change only by a three fifths vote of a quorum of said board of directors." Id. § 3.

Section four, titled "Annual audits by State Auditor" and "Reports to [General] Assembly," states "[t]hat it shall be the duty of the State Auditor to make an annual audit of the accounts of the [Symphony], and make a report thereof to the General Assembly at each of its regular sessions, and the said [Symphony] shall be under the patronage and the control of the State." Id. § 4.

Section five, titled "Allocation from Contingency and Emergency Fund," states "[t]hat the Governor and Council of State are hereby authorized and empowered to allot a sum not exceeding [$2,000.00] a year from the Contingency and Emergency Fund to aid in the carrying on of the activities of the said [Symphony]; that all expenditures made by the said [Symphony] shall be subject to the Executive Budget Act of North Carolina." Id. § 5.

In 1973, the North Carolina General Assembly reorganized the State's government. See Executive Organization Act of 1973 ("EOA"), H.B. 1127, 1973 General Assemb., First Sess. (N.C. 1973). The EOA created the "Department of Cultural Resources" vesting all "executive and administrative powers, duties, and functions not including those of the General Assembly and its agencies, the General Court of Justice and the administrative agencies created pursuant to Article

**4**

IV of the Constitution of North Carolina, and Higher Education previously vested by law in the several States agencies" in the department. EOA §§ 6, 29. The EOA placed the Symphony under the Department of Cultural Resources. See id. § 88. The EOA states:

> The [Symphony] shall continue to be under the patronage of the State as provided in Article 2 of Chapter 140 of the General Statutes of North Carolina. The governing body of the [Symphony] shall be a board of trustees consisting of not less than 16 members of which the Governor of the State and the Superintendent of Public Instruction shall be ex officio members and four other members shall be named by the Governor. The remaining trustees shall be chosen by members of the [Symphony] in such manner and for such terms as that body shall determine. The initial members named by the Governor shall be appointed from the members of the existing board of trustees of the [Symphony] for the balance of their existing terms. Subsequent appointments shall be made for terms of four years each.

Id. The EOA repealed section 140-6, titled "Trustees for [Symphony]," of the North Carolina General Statutes and transferred the language governing trustees to the EOA. N.C. Gen Stat., Vol. 3C 1964 Replacement Volume, § 140-6 (1964); see N.C. Gen. Stat. 1971 Cumulative Supplement, Volume 3C, art. 2, § 140-6. The EOA's language has not changed since 1973 and still governs the Symphony. See N.C. Gen. Stat. § 143B-94.

Today, the NCDNCR "manages" and "oversees" the Symphony. [D.E. 28-4] 8; see Am. Compl. ¶¶ 9, 16, 18; [D.E. 28-3] 2; [D.E. 28-8] 2. North Carolina General Statute § 140 governs its management.

Section 140-7, titled "Adoptions of bylaws; amendment," states "[t]he said board of trustees, when organized under the terms of this Article, shall have authority to adopt bylaws for the [Symphony] and said bylaws shall thereafter be subject to change only by a three-fifths vote of a quorum of said board of trustees." N.C. Gen. Stat. § 140-7.

Section 140-8, titled "Audit," states "[t]he operations of the [Symphony] shall be subject to the oversight of the State Auditor pursuant to Article 5A of Chapter 147 of the General Statutes." Id. § 140-8.

5

Section 140-9, titled "Allocations from Contingency and Emergency Fund; expenditures," states "[t]he Governor and Council of State are hereby authorized to allot such sums as they may deem appropriate, from the Contingency and Emergency Fund, to the [Symphony] to aid in carrying on the activities of the said Society. All expenditures made by said Society shall be subject to the provisions of the State Budget Act, Chapter 143C of the General Statutes." Id. § 140-9.

Section 140-10, titled "Counties and Municipalities authorized to make contributions," states "[t]he governing body of any county or incorporated municipality is hereby authorized and empowered to appropriate and make voluntary contributions out of nontax funds to the [Symphony]." Id. § 140-10.

The Symphony's 65 musicians perform at Meymandi Concert Hall in downtown Raleigh and throughout the Triangle region. See [D.E. 28-2] 2. The Symphony's mission is "to be North Carolina's State Orchestra, an orchestra achieving the highest level of artistic quality and performance standards, and embracing its dual legacies of statewide service and music education." [D.E. 28-13] 2; see Am. Compl. ¶ 27; [D.E. 28-14] 2.

The Symphony employs over 100 employees and has over 100 volunteers. See Am. Compl. ¶ 20; [D.E. 28-13] 3. It has a budget of approximately $12 million. See Am. Compl. ¶ 25; [D.E. 28-13] 3. Moreover, the State provides over $4 million in funding to the Symphony per year. See Am. Compl. ¶ 25.

Macdonald is the Symphony's President and Chief Executive Officer and a member of NCDNCR's leadership team. See id. at ¶ 11; [D.E. 28-7] 2. Additionally, Jennifer Lynne Blackman (Graphic Designer), Carol V. Brown ("Brown") (Accounting and Payroll Manager), Maria Hazel Ewing (Director of Advertising and Corporate Partnerships), Tiffany Mia Haddock ("Haddock") (Human Resources and Office Systems Manager), Richard Alan Hess

**6**

(Communications Project Manager), Mary Catherine Huntley (Director of Communications), and Stephen Lee Thompson (Executive Assistant to the President and Chief Executive Officer) are listed in the NCDNCR's employee directory and have government email addresses. See Am. Compl. ¶¶ 20–22; [D.E. 28-10] 2.[1] Additionally, Macdonald and Robert Schiller (Senior Vice President of Finance and CFO) both spend 55 hours per week working for the Symphony and 5 hours per week working for a related organization. See [D.E. 28-13] 12. The Symphony's Board Chair, Don Davis, spends five hours per week working for the Symphony and one hour per week working for a related organization. See id. at 9. A Symphony board member, Richard L. Daugherty, spends one hour per week working for the Symphony and one hour per week working for a related organization. See id. at 10.

In June 2003, Caudill won an audition and joined the Symphony's horn section. See Am. Compl. ¶ 34. Caudill was reared Roman Catholic and is now Buddhist. See id. at ¶ 38. Caudill had no performance issues during his employment. See id. at ¶ 82.

In 2006, Niketopoulos won an audition and also joined the Symphony's horn section. See id. at ¶ 35. Niketopoulos is Buddhist. See id. at ¶¶ 39–40. Niketopoulos had no performance issues during her employment. See id. at ¶ 82. Caudill and Niketopoulos are married. See id. at ¶ 36.

More than 15 years ago, Friedlander won an audition and joined the Symphony as Associate Concertmaster. See id. at ¶ 37. Friedlander is Jewish. See id. at ¶ 41. Friedlander had no performance issues during his employment. See id. at ¶ 82.

---

[1] Haddock also has a Symphony email address. See [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2.

In 2020, the COVID-19 pandemic struck, and the Symphony did not produce live performances. See id. at ¶ 42. The Symphony, however, broadcast live performances online with a reduced orchestra. See id. at ¶ 43. To limit COVID-19 performance exposures for the broadcast performances, musicians tested for COVID-19, engaged in social distancing, played with plexiglass shields, sat with six feet between musicians, and split stands (necessary for strings only). See id. Plaintiffs were still paid for the season but had a 20% salary reduction. See id. at ¶ 42.

In August 2021, the North Carolina Symphony Player's Association ("Union") in connection with the Symphony, announced the 2021–2022 season COVID-19 vaccination policy. See id. at ¶ 45. The policy required full vaccination or an "approved accommodation" for "medical" or "bona fide religious reasons" no later than October 26, 2021, and any musician failing to get vaccinated by this date would be placed on "a year of unpaid leave with benefits." [D.E. 28-22] ¶ 3; see Am Compl. ¶ 45.

Musicians had to request, no later than September 11, 2021, at 5:00 PM, any religious or medical exemption from the vaccine. See [D.E. 28-22] 2 n.*. Musicians could request and submit accommodations requests to Haddock, who is a NCDNCR employee serving as the Human Resources and Office Systems Manager at the Symphony. See Am Compl. ¶¶ 20, 22, 45. The religious accommodation request form required musicians to name a spiritual leader who would certify that the requesting musician had "a religious basis for the request for an accommodation or exemption" for religious reasons. [D.E. 28-23] 3; see Am. Compl. ¶ 48. Macdonald had the final authority to approve any exemptions or accommodations to the vaccine policy. See Am. Compl. ¶ 46.

Any individual who received an exemption or accommodation was required to test twice weekly for COVID-19, quarantine in compliance with the CDC's quarantine guidelines following

8

a positive test, and sit in a socially distanced manner. See id. at ¶ 47; [D.E. 28-22] ¶ 4. Any musicians who tested positive for COVID-19 would be placed on paid leave until the musician produced a negative PCR test. See [D.E. 28-22] ¶ 4.

If an individual was not vaccinated and did not receive an exemption by the end of the 2021–2022 season, then their job status would be "reviewed and [discussed] to determine what their long-term plans [were] with the [Symphony]." Id. at ¶ 4.

In September 2021, plaintiffs each sought a religious exemption from the COVID-19 vaccine requirement because taking the available vaccines violated their faiths. See Am. Compl. ¶ 49. Caudill and Niketopoulos believe the vaccines violate their Buddhist faith because the vaccines had been tested on animals and cell lines from aborted fetuses. See id. Friedlander believes that the vaccines violate his Jewish faith because he is not allowed to alter or defile his body. See id. at ¶ 50. Friedlander has never received any vaccinations. See id. Additionally, Friedlander does not take anything unclean into his body, including products from unclean animals. See id. In seeking a religious exemption, plaintiffs did not submit a signed statement from a religious leader because they believed such a requirement violated their rights under the United States Constitution and Title VII. See id. at ¶ 51.

On September 14, 2021, Macdonald denied plaintiffs' accommodation requests because they created "undue hardship" for the Symphony. Id. at ¶¶ 53, 55; see [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2. Macdonald stated that plaintiffs' requests "would be impossible to maintain the social distancing that would be required under applicable CDC guidance . . . onstage, backstage, and on buses" and "[would] endanger the health and safety of" other musicians, employees, and audience members. [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2; see Am. Compl. ¶ 55. Macdonald also opined that plaintiffs "submitted insufficient information to qualify

9

for consideration for an accommodation based upon [their] identified belief." Am. Compl. ¶ 53; see [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2. Finally, Macdonald noted that by April 1, 2022, the end of the 2021–2022 season, plaintiffs would have their job "status . . . reviewed and discussed in light of the then current policy to determine [the musician's] long-term status with [Symphony]." [D.E. 28-24] 2; see [D.E. 28-25] 2; [D.E. 28-26] 2; Am. Compl. ¶ 56.

Throughout fall 2021, the Symphony allowed unvaccinated patrons to attend performances by providing a negative COVID-19 test taken within 72 hours of the performance start. See Am. Compl. ¶ 62. Masking was required at certain venues, typically in compliance with local mask mandates. See id.

In December 2021, the Symphony sent 2022–2023 individual employment agreements to plaintiffs. See Am. Compl. ¶ 58; [D.E. 28-28] 2–3; [D.E. 28-29] 2. Acceptance of the agreement was contingent upon compliance with the Symphony's COVID-19 vaccination policy. See Am. Compl. ¶ 58; [D.E. 28-28] 2–3; [D.E. 28-29] 2.

On February 14, 2022, Donald Tippett ("Tippett"), the Symphony's Vice President of Orchestra Operations, emailed plaintiffs that the Symphony's decision to deny their religious accommodations request had not changed because "no alternatives . . . would provide the appropriate level of safety to [the Symphony's] musicians, staff, guests[,] and audience members." [D.E. 28-30] 2; see [D.E. 28-31] 2; [D.E. 28-32] 2; Am. Compl. ¶ 60. In the email, Tippett promised to contact the plaintiffs to "discuss [their] future employment status" with the Symphony if the plaintiffs failed to get vaccinated. [D.E. 28-30] 2; see [D.E. 28-31] 2; [D.E. 28-32] 2; Am. Compl. ¶ 60. Plaintiffs allege that the Symphony refused to consider any reasonable accommodation throughout this process, despite ongoing research at major research institutions

into potential accommodations. See Am. Compl. ¶¶ 63–69. Plaintiffs also allege that Macdonald wanted to promote a "vaccination 'culture'" within the Symphony. Id. at ¶ 69.

In March 2022, the Symphony stopped requiring patrons to wear masks in Meymandi Concert Hall. See id. at ¶ 62. On May 17, 2022, Macdonald sent plaintiffs letters informing them that their employment would be terminated on June 30, 2022, for failing to comply with the COVID-19 vaccination policy. See id. at ¶ 70; [D.E. 28-34] 2–3. The Symphony asserted that the unpaid leave of absence with health benefits was a reasonable accommodation but that continuing to provide an unpaid leave of absence with health benefits created an undue hardship. See Am. Compl. ¶ 70; [D.E. 28-34] 2–3.

On August 19, 2022, Niketopoulos filed a charge with the Equal Employment Opportunity Commission ("EEOC") against the Symphony for religious discrimination occurring on May 17, 2022, the day Macdonald informed Niketopoulos her employment would be terminated. See Am. Compl. ¶ 71; [D.E. 28-38] 2. On September 19, 2022, Caudill filed a charge with the EEOC against the Symphony for religious discrimination occurring on June 30, 2022, the day the Symphony terminated his employment. See Am. Compl. ¶ 71; [D.E. 28-36] 2. On October 22, 2022, Friedlander filed a charge with the EEOC against the Symphony for religious discrimination occurring from September 1, 2021, to June 1, 2022, which includes being informed of the vaccination policy to the time shortly after Friedlander learned his employment would be terminated. See Am. Compl. ¶ 71; [D.E. 28-37] 2–3.

On June 4, 2023, the EEOC issued right to sue letters to plaintiffs. See Am. Compl. ¶ 73; [D.E. 28-39] 2; [D.E. 28-40] 2; [D.E. 28-41] 2. In July 2023, the Symphony ended the COVID-19 vaccination mandate "to 'limit jeopardizing'" the Symphony's relationships "with the legislature." Am. Compl. ¶¶ 77–78.

## II.

### A.

On November 3, 2023, defendants moved to dismiss plaintiffs' complaint. See [D.E. 22, 24]. On November 24, 2023, plaintiffs filed an amended complaint, adding additional allegations and two more claims for relief. See [D.E. 26]. Accordingly, the court dismisses as moot defendants' motions to dismiss plaintiffs' complaint.

### B.

Defendants argue that plaintiffs lack standing for their requested injunctive relief of reinstatement. See [D.E. 32] 30. A motion to dismiss under Rule 12(b)(1) for lack of standing tests subject-matter jurisdiction, which is the court's "statutory or constitutional power to adjudicate the case." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998) (emphasis omitted); see Fed. R. Civ. P. 12(b)(1). A federal court "must determine that it has subject-matter jurisdiction over [a claim] before it can pass on the merits of that [claim]." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479–80 (4th Cir. 2005). When considering a Rule 12(b)(1) motion, the court "may consider evidence outside the pleadings without converting the proceeding into one for summary judgment." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005) (quotation omitted); see Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). A plaintiff must establish that this court has subject-matter jurisdiction over his or her claims. See, e.g., Steel, 523 U.S. at 104; Evans, 166 F.3d at 647; Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). However, "when a defendant asserts that the complaint fails to allege sufficient facts to support subject[-]matter jurisdiction, the . . . court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the

12

facts alleged [in the complaint and any additional materials]." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009).

A plaintiff establishes standing by showing: (1) that the plaintiff has "'suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'"; (2) "'a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court'"; and (3) that it is "'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision'" from the court. Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1265 (4th Cir. 1995) (alterations omitted) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). Standing for injunctive relief must be based on future, not past, injury. See City of Los Angeles v. Lyons, 461 U.S. 95, 102–03 (1983).

Plaintiffs were terminated from their jobs at the Symphony because they refused to receive a COVID-19 vaccine on the basis of their religion. See Am. Compl. ¶¶ 53, 55; [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2. They now seek reinstatement, a prospective remedy, which would remedy their ongoing injury. See Am Compl. ¶¶ 79–106. Although the Symphony dropped the COVID-19 vaccine mandate, plaintiffs cannot simply apply for their jobs to be reinstated. The Symphony hired Friedlander's replacement. See Am. Compl. ¶ 74. The Symphony has not yet replaced Caudill or Niketopoulos, and defendants have not scheduled any auditions for Caudill or Niketopoulos' positions. See id. Accordingly, plaintiffs have standing to seek injunctive relief.

C.

Plaintiffs bring their section 1983 claims against Macdonald in both her individual and official capacities. See Am. Compl. ¶¶ 93–114. A claim against a public official sued in her official

13

capacity is "essentially a claim against" the government entity the official represents. Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004); see Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006). Thus, plaintiffs' claims against Macdonald in her official capacity are functionally brought against the Symphony and NCDNCR. See Am. Compl. ¶¶ 93–114; Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469 (4th Cir. 2013) ("For purposes of section 1983, these official-capacity suits [against government officials] are treated as suits against the municipality." (cleaned up)); see also Hafer v. Melo, 502 U.S. 21, 25 (1991). Accordingly, the court dismisses plaintiffs' official capacity claims against Macdonald.

## D.

Defendants allege that plaintiffs failed to allege retaliation in their EEOC charges, thus barring plaintiffs from pursing Title VII retaliation claims in this court. See [D.E. 32] 31–36, 31 n.7; [D.E. 34] 17–19; [D.E. 45] 5–6; [D.E. 46] 2–7. Before a person may file a claim in court under Title VII, the person must file a charge of discrimination with the EEOC. See 42 U.S.C. § 2000e–5(f)(1). An EEOC charge suffices "only if it is sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Chacko v. Patuxent Inst., 429 F.3d 505, 508 (4th Cir. 2005) (quotation omitted); see Miles v. Dell, Inc., 429 F.3d 480, 491–92 (4th Cir. 2005). Moreover, the content of the EEOC charge determines the scope of the plaintiff's right to maintain a Title VII claim in court. See, e.g., Hentosh v. Old Dominion Univ., 767 F.3d 413, 416–17 (4th Cir. 2014), abrogated on other grounds by Fort Bend Cnty. v. Davis, 587 U.S. 541 (2019); Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132–33 (4th Cir. 2002). "Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a

14

subsequent Title VII lawsuit." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996); see Sydnor v. Fairfax Cnty., 681 F.3d 591, 594 (4th Cir. 2012); Miles, 429 F.3d at 491–92; Bryant, 288 F.3d at 132–33. "Thus, a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009), abrogated on other grounds by Davis, 587 U.S. 541; Bonds v. Leavitt, 629 F.3d 369, 379 (4th Cir. 2011). The same principle applies with respect to a plaintiff who files an EEOC charge with respect to one adverse employment action (such as a failure to rehire), but then seeks to expand the formal litigation claim to a separate adverse employment action (such as an earlier termination). See Bonds, 629 F.3d at 379–80; Jones, 551 F.3d at 300; Miles, 429 F.3d at 491–92; Chacko, 429 F.3d at 509; Bryant, 288 F.3d at 132–33; Evans, 80 F.3d at 963. The rationale behind these principles concerning the scope of an EEOC charge relates to providing fair notice to an employer concerning a charge and to permitting the EEOC to investigate and (if appropriate) resolve the dispute without a lawsuit. See, e.g., Chacko, 429 F.3d at 508–09, 513; Miles, 429 F.3d at 491.

Plaintiffs did not allege retaliation in their EEOC charges. See [D.E. 28-36] 2 (alleging only religion in the "discrimination based on" section); [D.E. 28-37] 2–3 (same); [D.E. 28-38] 2 (same); [D.E. 32] 31 n.7; [D.E. 34] 17–19; [D.E. 45] 5–6. Rather, plaintiffs alleged that the Symphony discriminated against them because of their religion, not in retaliation for engaging in protected activity. See [D.E. 28-36] 2–3; [D.E. 28-37] 2–3; [D.E. 28-38] 2. In their amended complaint, however, plaintiffs allege that they requested a religious accommodation from the COVID-19 vaccine, and the "denial of [p]laintiffs' requested religious accommodation, placing them on unpaid leave, and firing of [p]laintiffs violates Title VII's prohibition against religious

discrimination and retaliation." Am. Compl. ¶¶ 85, 88. Plaintiffs failed to place NCDNCR and the Symphony on notice with their EEOC charges of a Title VII retaliation claim. See, e.g., Miles, 429 F.3d at 492; EEOC v. 1618 Concepts, Inc., 432 F. Supp. 3d 595, 602 (M.D.N.C. 2020). Accordingly, the court dismisses plaintiffs' Title VII retaliation claims against NCDNCR and the Symphony.

E.

NCDNCR alleges that plaintiffs failed to name NCDNCR in their EEOC charge. See [D.E. 28-36] 2; [D.E. 28-37] 2–3; [D.E. 28-38] 2. Thus, NCDNCR argues that plaintiffs cannot pursue their Title VII claims against NCDNCR. See [D.E 32] 31–36; [D.E. 46] 2–7. Plaintiffs respond that they have plausibly alleged NCDNCR is either a joint employer or integrated employer with the Symphony and that NCDNCR falls under the substantial identity exception to the naming requirement. See [D.E. 40] 37–50.

Under Title VII, more than one collective entity can be an individual's employer. See, e.g., Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404, 410 (4th Cir. 2015). A parent corporation can be an employer when it exercises excessive control in one of two ways: either (1) when it "control[s] the employment practices and decisions of the subsidiary," or (2) when it so "dominate[s] the subsidiary's operations that the parent and the subsidiary are one entity and thus one employer." Johnson v. Flowers Indus., Inc., 814 F.2d 978, 981 (4th Cir. 1987). Since Johnson, two separate doctrines have emerged: the joint employer doctrine and the integrated employer doctrine. See Butler, 793 F.3d at 408 n.3; see, e.g., Evans v. Capitol Broad. Co., Inc., ___ F. Supp. 3d ___, 2024 WL 535189, at *3–4 (E.D.N.C. Feb. 9, 2024).

16

Under the joint employer doctrine, courts analyze whether a putative employer "exercises significant control over the same employees." Butler, 793 F.3d at 410 (cleaned up). The Fourth Circuit has adopted a hybrid test for assessing joint employment, which requires analyzing:

> (1) authority to hire and fire the individual; (2) day-to-day supervision of the individual, including employee discipline; (3) whether the putative employer furnishes the equipment used and the place of work; (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes; (5) the length of time during which the individual has worked for the putative employer; (6) whether the putative employer provides the individual with formal or informal training; (7) whether the individual's duties are akin to a regular employee's duties; (8) whether the individual is assigned solely to the putative employer; and (9) whether the individual and putative employer intended to enter into an employment relationship.

Id. at 414. The first three factors are the most important, but no one factor is determinative. See id. at 414–15.

The second doctrine outlined in Johnson is commonly referred to as the integrated employer doctrine and requires a court to examine four factors. See Bittle-Lindsey v. Seegars Fence Co., No. 21-1044, 2022 WL 1566770, at *3 (4th Cir. May 18, 2022) (unpublished). The four factors are "(1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." Id. (quotation omitted). No single factor is determinative, but centralized control of labor operations is the most important factor. See id.; Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir. 1999), abrogated on other grounds by Arbaugh v. Y & H Corp., 546 U.S. 500 (2006).

Analyzing the factors under either doctrine is a "fact-specific" inquiry, and discovery sometimes is required to disclose "the defendants' relationship to each other." West v. J.O. Stevenson, Inc., 164 F. Supp. 3d 751, 764 (E.D.N.C. 2016); see Ali v. WorldWide Language Res., LLC, 686 F. Supp. 3d 430, 451–52 (E.D.N.C. 2023); Tasciyan v. Med. Numerics, 820 F. Supp. 2d 664, 672 (D. Md. 2011). Notwithstanding the fact-specific inquiry under each doctrine, the

"complaint still must plausibly allege some facts to support either the 'joint employment' or 'integrated employer' theory, or else risk undermining the Twombly-Iqbal standard." West, 164 F. Supp. 3d at 764.

Macdonald is listed as a member of NCDNCR's leadership team, and seven other Symphony employees, including the Accounting and Payroll Manager, Human Resources and Office Systems Manager, and Executive Assistant to Macdonald, are identified as state government employees. See Am. Compl. ¶¶ 11, 20–22; [D.E. 28-7] 2; [D.E. 28-10] 2. Plaintiffs plausibly allege that Macdonald, Haddock, and Brown provide day-to-day supervision and discipline and possess personnel information for the Symphony's employees. See Am. Compl. ¶ 22. Plaintiffs plausibly allege Macdonald denied plaintiffs' accommodation requests because they created "undue hardship" for the Symphony, allowing a reasonable inference that Macdonald had the authority to make employment decisions, up to and including termination. Id. at ¶¶ 53, 55.

Some facts in the amended complaint weigh against considering the NCDNCR a joint employer. Specifically, all plaintiffs were employed with the Symphony for over 15 years, the Symphony hired plaintiffs, and plaintiffs allege no training through the Symphony or the NCDNCR. See id. at ¶¶ 20, 34–37. Additionally, plaintiffs' duties are akin to their musician colleagues' duties but not to management's duties. Moreover, plaintiffs do not allege that the State directly employs any union Symphony musicians, and plaintiffs do not allege that plaintiffs are assigned to work outside the Symphony. Thus, the amended complaint does not reflect NCDNCR's intent to enter into an employment relationship.

Plaintiffs do not allege any facts weighing for or against the equipment and place of work factor.

The first three factors of the hybrid test for assessing joint employment are the most important. See Butler, 793 F.3d at 414–15. Viewing the allegations in the amended complaint in the light most favorable to plaintiffs, plaintiffs have plausibly alleged that NCDNCR was a joint employer.

Alternatively, even if plaintiffs had failed to plausibly allege that NCDNCR was a joint employer, plaintiffs plausibly alleged that NCDNCR is an integrated employer. In favor of considering NCDNCR as an integrated employer, the court first notes the common management and centralized control of labor relations. Plaintiffs allege that Macdonald, Haddock, and Brown provide day-to-day supervision and discipline and possess personnel information for the Symphony's employees. See Am. Compl. ¶ 22. As for interrelation of operations, the NCDNCR "manages" and "oversees" the Symphony. [D.E. 28-4] 8; see Am. Compl. ¶¶ 9, 16, 18; [D.E. 28-3] 2; [D.E. 28-8] 2.

As for financial control, the Symphony is "under the patronage of the State," with a Board of Trustees including four members "named by the Governor" and the "Governor . . . and the Superintendent of Public Instruction" as "ex officio members." EOA § 140-8. Moreover, "[t]he operations of the [Symphony] [are] subject to the oversight of the State Auditor." EOA § 140-8. Section 140-8, titled "Audit," states "[t]he operations of the [Symphony] shall be subject to the oversight of the State Auditor pursuant to Article 5A of Chapter 147 of the General Statutes." Id. § 140-8. Additionally, "[t]he Governor and Council of State [can] allot such sums . . . to the [Symphony] to aid in carrying on the activities of the said Society." Id. § 140-9. All Symphony expenditures are subject to the State Budget Act. See id. Finally, the State employs Brown, who is the Accounting and Payroll Manager. See Am. Compl. ¶ 20. Thus, this factor weighs heavily in favor of the State and the Symphony being an integrated employer.

In opposition, defendants argue that plaintiffs are not State employees because plaintiffs' contracts are between the musician and the Symphony, and the NCDNCR cannot contract with any labor union. See [D.E. 32] 16. Even if true, these facts about the contracts do not mean that the Symphony and the NCDNCR cannot be an integrated employer. Cf. Polcari v. John F. Kennedy Ctr. for Performing Arts, 712 F. Supp. 230, 231 (D.D.C. 1989) (holding that the Kennedy Center was a federal agency under the Federal Tort Claims Act because of its "national function as well as the Government's substantial funding and oversight of its functions," in addition to being "governed by a Board of Trustees comprised of [30] general trustees appointed by the President of the United States and [15] ex officio members.") Accordingly, plaintiffs have plausibly alleged that the State and the Symphony are an integrated employer.

F.

Next, NCDNCR argues that because plaintiffs failed to name NCDNCR in their EEOC charges, plaintiffs cannot pursue Title VII claims in this court against NCDNCR. Plaintiffs respond that a party not named in an EEOC charge may still be held liable under the "substantial identity" exception to the naming requirement. See, e.g., Evans, 2024 WL 535189, at *5–6; Harris v. VCU Health Sys. Auth., No. 3:23CV481, 2023 WL 7130854, at *4 (E.D. Va. Oct. 30, 2023) (unpublished); 1618 Concepts, Inc., 432 F. Supp. 3d at 603–04; Lima v. Stanley, No. 5:14-CV-896, 2015 WL 4769546, at *5 (E.D.N.C. Aug. 12, 2015) (unpublished); cf. Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll., 848 F.2d 457, 461 (4th Cir. 1988) (expressing "no opinion on the validity of the exception").

Under the substantial identity exception, a court considers the following factors:

1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether . . . the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be

20

> unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Glus v. G. C. Murphy Co., 562 F.2d 880, 887–88 (3d Cir. 1977). The second and third factors reflect the two-fold purpose of the naming requirement, that is, providing notice and opportunity for voluntary conciliation. See Shaughnessy v. Duke Univ., No. 1:18-CV-461, 2018 WL 6047277, at *4 (M.D.N.C. Nov. 19, 2018); Keener v. Universal Cos., 128 F. Supp. 3d 902, 915–16 (M.D.N.C. 2015); Mayo v. Questech, Inc., 727 F. Supp. 1007, 1011 (E.D. Va. 1989).

As for the first factor, plaintiffs could have reasonably ascertained NCDNCR's identity when they filed their EEOC charges. See, e.g., [D.E. 28-16] 2; [D.E. 28-17] 2. Thus, this factor weighs against finding substantial identity.

As for the second factor and third factor, plaintiffs submitted accommodation requests to Haddock. In response, Macdonald, who represents both the NCDNCR's and the Symphony's interests, sent the refusals to accommodate and termination letters. See Am. Compl. ¶¶ 20, 22, 45, 46, 53, 55; [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2. Additionally, Macdonald and other Symphony employees served on NCDNCR's diversity, equity, and inclusion committee. See [D.E. 28-4] 31. These facts support NCDNCR having notice because of similar interests. As for the fourth factor, NCDNCR made clear that plaintiffs' relationship was with the Symphony but also conveyed that the Symphony was a division of the NCDNCR. See, e.g., Am. Compl. ¶¶ 28–29; [D.E. 28-16] 2; [D.E. 28-17] 2; [D.E. 28-18] 2; [D.E. 28-19] 2. Viewing the allegations in the amended complaint in the light most favorable to plaintiffs, plaintiffs plausibly allege that NCDNCR meets the substantial identity exception. Thus, plaintiffs may pursue their Title VII religion claims against NCDNCR and the Symphony.

G.

Defendants argue that plaintiffs failed to timely file their EEOC charges. See [D.E. 32] 36–38; [D.E. 34] 11–15; [D.E. 45] 2–4. Under Title VII, plaintiffs had to file their EEOC charges within 180 days of each alleged discrete act of discrimination under Title VII. See, e.g., 42 U.S.C. § 2000e-5(e)(1), (f)(1); Davis, 587 U.S. at 544; Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109–15 (2002); EEOC v. Com. Off. Prods. Co., 486 U.S. 107, 110 (1988); Williams v. Giant Food Inc., 370 F.3d 423, 428 (4th Cir. 2004); Bryant, 288 F.3d at 132; Coleman v. Altec, Inc., No. 5:16-CV-954, 2018 WL 4289610, at *2 (E.D.N.C. Sept. 7, 2018) (unpublished); Young v. Onslow Water & Sewer Auth., No. 7:16-CV-259, 2018 WL 405975, at *4 (E.D.N.C. Jan. 12, 2018) (unpublished); Barcliff v. N.C. League of Muns., No. 5:10-CV-244, 2011 WL 3290578, at *2 (E.D.N.C. Aug. 1, 2011) (unpublished); Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 539 (E.D.N.C. 2008); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 606 n.3 (E.D.N.C. 2006). If a party fails to timely file an EEOC charge, the party "lose[s] the ability to recover for" that claim because the claim is not "actionable." Morgan, 536 U.S. at 110, 113. Only adverse employment actions "that took place within the timely filing period are actionable." Id. at 114; see Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 623–24 (2007), superseded by statute on other grounds, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5; Williams, 370 F.3d at 428; Evans, 80 F.3d at 963; Coleman, 2018 WL 4289610, at *2; Young, 2018 WL 405975, at *4–5; Cooper v. Smithfield Packing Inc., No. 5:10-CV-479, 2011 WL 3207912, at *3 (E.D.N.C. July 27, 2011) (unpublished); Barcliff, 2011 WL 3290578, at *4; McDougal-Wilson, 427 F. Supp. 2d at 606 n.3.

Determining the timeliness of plaintiffs' EEOC charges requires the court to identify the precise "unlawful employment practice" at issue. Del. State Coll. v. Ricks, 449 U.S. 250, 257

22

(1980). "Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." Id.; United Air Lines, Inc. v. Evans, 431 U.S. 553, 558 (1977). "The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Ricks, 449 U.S. at 258 (quotation omitted); United Air Lines, Inc., 431 U.S. at 558. The cause of action arises in a Title VII case "when the employee receives unequivocal notice of the facts giving rise to his claim or a reasonable person would know of the facts giving rise to a claim." Burfield v. Brown, Moore & Flint, Inc., 51 F.3d 583, 589 (5th Cir. 1995) (per curiam); see Hearn v. Town of Oak Island, No. 21-1598, 2022 WL 7935994, at *1 (4th Cir. Oct. 14, 2022) (per curiam) (unpublished); Martin v. Sw. Va. Gas Co., 135 F.3d 307, 310 (4th Cir. 1998) (collecting cases); English v. Whitfield, 858 F.2d 957, 961–62 (4th Cir. 1988).

The amended complaint alleges three adverse employment actions. First, on September 14, 2021, Macdonald denied plaintiffs' accommodation requests for the 2021–2022 season because they created "undue hardship" for the Symphony. Am. Compl. ¶¶ 53, 55; see [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2. Second, on February 14, 2022, Tippett emailed plaintiffs denying their religious accommodations request for the 2022–2023 season. See [D.E. 28-30] 2; [D.E. 28-31] 2; [D.E. 28-32] 2; Am. Compl. ¶ 60. Third, on May 17, 2022, Macdonald sent plaintiffs letters informing them that their employment would be terminated on June 30, 2022, for failing to comply with the COVID-19 vaccination policy. See Am. Compl. ¶ 70; [D.E. 28-34] 2–3.

Plaintiffs argue that the Title VII claims did not accrue until May 17, 2022, when defendants "finally denied [p]laintiffs' requests for accommodation and informed them that their employment was being terminated" on June 30, 2022. [D.E. 40] 14; see [D.E. 40] 26–31. Additionally, plaintiffs argue that the May 17, 2022 letter reflects both a failure-to-accommodate

23

claim and a disparate treatment claim. See [D.E. 40] 33–35. Defendants respond that there were only two possible adverse employment actions: the September 14, 2021 alleged failure-to-accommodate and the February 14, 2022 alleged failure-to-accommodate. See [D.E. 32] 36–38; [D.E. 34] 11–15; [D.E. 45] 2–4. Defendants contend that the termination notice on May 17, 2022, was simply a consequence of the February 14, 2022 failure-to-accommodate. See [D.E. 32] 37–38; [D.E. 34] 11–15; [D.E. 45] 2–4.

The September 14, 2021 denial of accommodations denies accommodations only for the 2021–2022 season. See Am. Compl. ¶¶ 53, 55; [D.E. 28-24] 2; [D.E. 28-25] 2; [D.E. 28-26] 2. Moreover, only Friedlander alleges discriminatory conduct during this period. See Am. Compl. ¶ 71; [D.E. 28-36] 2; [D.E. 28-37] 2–3; [D.E. 28-38] 2.

The 180-day filing period for Friedlander's September 14, 2021 failure to accommodate claim for the 2021–2022 season ended on Thursday, March 3, 2022. See, e.g., Morgan, 536 U.S. at 109–14; Ricks, 449 U.S. 250; 42 U.S.C. § 2000e-5(e)(1). Accordingly, Friedlander's September 14, 2021 failure-to-accommodate claim is time-barred, and the court dismisses that claim.

The February 14, 2022 denial of accommodations denies accommodations only for the 2022–2023 season. See [D.E. 28-30] 2; [D.E. 28-31] 2; [D.E. 28-32] 2; Am. Compl. ¶ 60. Again, only Friedlander alleges discriminatory conduct during this period. See Am. Compl. ¶ 71; [D.E. 28-36] 2; [D.E. 28-37] 2–3; [D.E. 28-38] 2.

The 180-day filing period for the February 14, 2022 failure-to-accommodate claim for the 2022–2023 season ended on Monday, August 15, 2022. See, e.g., Morgan, 536 U.S. at 109–14; Ricks, 449 U.S. 250, 257–58; 42 U.S.C. § 2000e-5(e)(1). Accordingly, Friedlander's February 4, 2022 failure-to-accommodate claim is time-barred, and the court dismisses that claim.

The May 17, 2022 termination letter unequivocally notified plaintiffs that their employment would end on June 30, 2022. See Am. Compl. ¶ 70; [D.E. 28-34] 2–3. Defendants disagree and essentially argue that plaintiffs "had [termination] coming"[2] and should have known that termination was inevitable based on the September 14, 2021 decision and the February 14, 2022 decision.

Title VII requires "unequivocal notice." Martin, 135 F.3d at 310. Notably, Macdonald stated on September 14, 2021, that by April 1, 2022, the end of the 2021–2022 season, plaintiffs would have their job "status . . . reviewed and discussed in light of the then current policy to determine [the musician's] long-term status with [the Symphony]." [D.E. 28-24] 2; see [D.E. 28-25] 2; [D.E. 28-26] 2; Am. Compl. ¶ 56. Moreover, the February 14, 2022 email from Tippett promised to "contact[] [the plaintiffs] to discuss [their] future employment status" with the Symphony if the plaintiffs failed to get vaccinated. [D.E. 28-30] 2; see [D.E. 28-31] 2; [D.E. 28-32] 2; Am. Compl. ¶ 60. Macdonald's statement on September 14, 2021, and Tippett's February 14, 2022 email are not unequivocal notice of any adverse employment action, let alone termination. See, e.g., Faircloth v. Goodyear Tire & Rubber Co., No. 5:13-CV-336, 2013 WL 6410233, at *2–3 (E.D.N.C. Dec. 9, 2013) (unpublished). The 180-day filing period for the May 17, 2022 discrimination and failure-to-accommodate claim for the 2023–2024 season and beyond ended on Monday, November 14, 2022. See 42 U.S.C. § 2000e-5(e)(1); see, e.g., Morgan, 536 U.S. at 109–14; Ricks, 449 U.S. 250, 257–58. Accordingly, plaintiffs' May 17, 2022 Title VII disparate treatment and failure-to-accommodate claims are timely.

---

[2] John Kander & Fred Ebb, Cell Block Tango, Chicago (1975) (describing various ways by which an individual might suggest they "ha[ve] it coming").

## H.

Alternatively, plaintiffs argue that the court should apply equitable tolling to block the NCDNCR and the Symphony from successfully asserting the 180-day limitations period. See [D.E. 40] 31–33; Am. Compl. ¶ 90. Equitable tolling applies only when there are "(1) extraordinary circumstances, (2) beyond [a party's] control or external to [the party's] own conduct, (3) that prevented [the party] from filing on time." Rouse v. Lee, 339 F.3d 238, 246 (4th Cir. 2003) (en banc); see United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004). "Principles of equitable tolling do not extend to garden variety claims of excusable neglect." Rouse, 339 F.3d at 246; see Irwin v. Dep't of Veterans Affs., 498 U.S. 89, 96 (1990); English v. Pabst Brewing Co., 828 F.2d 1047, 1048–49 (4th Cir. 1987).

The "extraordinary circumstances" standard is "demanding." Bratcher, 545 F. Supp. 2d at 543. The party seeking the "extraordinary remedy" of equitable tolling bears "a considerable burden to demonstrate that it applies." CVLR Performance Horses, Inc. v. Wynne, 792 F.3d 469, 476 (4th Cir. 2015). A party seeking such relief must show that he diligently pursued his rights, but that an extraordinary circumstance external to his own conduct prevented him from timely filing an EEOC charge or complaint in federal court. See, e.g., Holland v. Florida, 560 U.S. 631, 649 (2010); Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); CVLR Performance Horses, Inc., 792 F.3d at 476.

Even assuming that plaintiffs' explanations are true, those explanations do not constitute extraordinary circumstances beyond plaintiffs' control that prevented them from filing EEOC charges concerning the adverse employment action of September 14, 2021, and of February 14, 2022. Plaintiffs were simply hopeful that filing an EEOC charge would not be necessary. See Am. Compl. ¶ 61. Hope is a wonderful virtue. Hope is not a wonderful EEOC strategy or litigation

26

strategy. Accordingly, the court will not toll the statute of limitations for the September 14, 2021 adverse employment action or the February 14, 2022 adverse employment action.

III.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [his or her] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense." Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials

27

"attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

## A.

In count one, plaintiffs allege a Title VII religious discrimination claim against NCDNCR and the Symphony. See Am. Compl. ¶¶ 79–92. A plaintiff need not plead a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973), to survive a motion to dismiss. See, e.g., Barbour v. Garland, 105 F.4th 579, 590 (4th Cir. 2024); Holloway v. Maryland, 32 F. 4th 293, 298 (4th Cir. 2022); Bing v. Bravo Sys., LLC, 959 F.3d 605, 616 (4th Cir. 2020); McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2015). In order to state a religious discrimination claim under Title VII, plaintiffs must plausibly allege that NCDNCR and the Symphony discriminated against them because of their religion with respect to their compensation, terms, conditions, or privilege of employment. See Passarella v. Aspirus, Inc., 108 F.4th 1005, 1009 (7th Cir. 2024); Dodson v. Lutheran Vill. at Millers Grant, Inc., No. CV EA-23-169, 2024 WL 3597201, at *4 (D. Md. July 30, 2024) (unpublished); see also Kelly v. Town of Abingdon, 90

28

F.4th 158, 169 (4th Cir. 2024); Holloway, 32 F.4th at 299; Lemon v. Myers Bigel, P.A., 985 F.3d 392, 399–400 (4th Cir. 2021); Bing, 959 F 3d. at 616–17; McCleary-Evans, 780 F.3d at 585–86; Jordan v. Alt. Res. Corp., 458 F.3d 332, 346 (4th Cir. 2006), overruled on other grounds by Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264 (4th Cir. 2015) (en banc). At the motion to dismiss stage, an employee seeking a vaccine-mandate exemption must plausibly allege facts "permitting an inference that some aspect of the request is based on the employee's religious observance and practice or belief." Passarella, 108 F.4th at 1009 (quotation omitted).

In considering whether plaintiffs plausibly alleged a religious discrimination claim under Title VII, plaintiffs must plausibly allege an adverse employment action. See, e.g., Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024); Holloway, 32 F.4th at 299; Bing, 959 F.3d. at 616–17; McCleary-Evans, 780 F.3d at 585–86. An adverse employment action does not require a "significant . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar" change in working conditions. Muldrow, 601 U.S. at 355 (quotation omitted). Rather, it requires "some harm respecting an identifiable term or condition of employment." Id.; see Yates v. Spring Indep. Sch. Dist., ___ F.4th ___, 2024 WL 3928095, at *4 (5th Cir. Aug. 26, 2024); Stratton v. Bentley Univ., 113 F.4th 25, 38 n.6 (1st Cir. 2024); Peifer v. Bd. of Prob. & Parole, 106 F.4th 270, 277 (3d Cir. 2024); Rios v. Centerra Grp. LLC, 106 F.4th 101, 112 (1st Cir. 2024); Cole v. Grp. Health Plan, Inc., 105 F.4th 1110, 1114 (8th Cir. 2024); Milczak v. Gen. Motors, LLC, 102 F.4th 772, 787 (6th Cir. 2024). Moreover, to "discriminate against means [to] treat worse." Muldrow, 601 U.S. at 355 (quotation omitted). An employee need only be "treat[ed] worse" respecting an identifiable term, condition, or privilege of employment based on his or her protected status, such as religion. Id. Thus, an adverse employment action includes a "disadvantageous change to the compensation, terms,

conditions, or privileges of employment because of a protected status." Cole, 105 F.4th at 1114; see Rios, 106 F.4th at 112.

In Muldrow, a female police sergeant filed a Tile VII sex discrimination claim and alleged that the St. Louis Police Department transferred her from one job as a sergeant to another job as a sergeant because she was a woman. See Muldrow, 601 U.S. at 350. Specifically, she alleged that the St. Louis Police Department transferred her from a plainclothes job in the Intelligence Division to a uniformed job in the Department's Fifth District because of her sex. Id. at 351. Although the sergeant's "rank and pay remained the same in the new position, her responsibilities, perks, and schedule did not." Id. With respect to the requirement of an adverse employment action, the Supreme Court held that a Title VII plaintiff alleging a sexually discriminatory transfer had to show "that the transfer brought about some 'disadvantageous' change in an employment term or condition." Id. at 354 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998)). The Supreme Court explained that the phrase "terms, conditions, or privileges of employment" used in Title VII "is not used in the narrow contractual sense; it covers more than the economic or tangible." Id. (quotations omitted). Nonetheless, "[t]o make out a Title VII discrimination claim, a [claimant] must show some harm respecting an identifiable term or condition of employment." Id. at 354–55.

Plaintiffs plausibly allege that Caudill and Niketopoulos are Buddhist, and Friedlander is Jewish. See Am. Compl. ¶¶ 38–41. Plaintiffs plausibly allege that Macdonald did not grant their religious accommodations request "because of their religion," id. at ¶ 86, and because the "Symphony and [Macdonald] were hostile to religion generally and to [p]laintiffs' religion specifically." Id. at ¶ 89. As for an adverse employment action, plaintiffs plausibly allege that the Symphony and NCDNCR failed to accommodate plaintiffs' religious requests and terminated their

30

employment. See id. at ¶¶ 53, 55, 60, 70. Plaintiffs had no performance issues during their employment. See id. at ¶ 82. As for being treated worse, plaintiffs plausibly allege that everyone who received the vaccine was not fired. Accordingly, plaintiffs plausibly allege a religious discrimination claim against NCDNCR and the Symphony, and this claim may proceed.

**B.**

In count one, plaintiffs also allege a Title VII failure-to-accommodate religious discrimination claim against NCDNCR and the Symphony. See Am. Compl. ¶¶ 79–92. Title VII makes it an "unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). Religion "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. §2000e(j). An undue hardship requires an employer to "show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." Groff v. DeJoy, 600 U.S. 447, 470 (2023); see Dean v. Acts Ret. Life Communities, No. CV GLR-23-1221, 2024 WL 964218, at *6 (D. Md. Mar. 6, 2024) (unpublished).

For religious accommodation cases, a plaintiff must plausibly allege that "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; and (3) he or she was disciplined for failure to comply with the conflicting employment requirement." EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307,

31

312 (4th Cir. 2008) (quotation omitted); see Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1019 (4th Cir. 1996).

Plaintiffs plausibly allege that Caudill and Niketopoulos's Buddhist's beliefs and Friedlander's Jewish beliefs conflicted with the Symphony's COVID-19 vaccine requirement. See Am. Compl. ¶¶ 38–41, 49–51. Plaintiffs plausibly allege that they informed the Symphony and NCDNCR of this belief. See id. at ¶¶ 49–51. Plaintiffs plausibly allege that in response the Symphony and NCDNCR placed plaintiffs on unpaid leave for one year and then terminated their employment. See id. at ¶¶ 53, 55, 60, 70; [D.E. 28-30] 2; [D.E. 28-31] 2; [D.E. 28-32] 2; [D.E. 28-34] 2–3. Accordingly, plaintiffs plausibly allege a failure to accommodate claim under Title VII against NCDNCR and the Symphony, and this claim may proceed.

## C.

In count two, plaintiffs allege a violation of the First Amendment of the United States Constitution's Free Exercise Clause under 42 U.S.C. § 1983 against the Symphony and Macdonald. See Am. Compl. ¶¶ 93–106. "To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Additionally, a section 1983 plaintiff must plausibly allege the personal involvement of a defendant. See, e.g., Iqbal, 556 U.S. at 676–77; Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

Section 1983 does not regulate private conduct. See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d at 180–81 ("[M]erely private conduct, no matter how discriminatory or wrongful, fails to qualify as state action" (quotation and alteration omitted)); Mentavlos v. Anderson, 249 F.3d 301, 310 (4th Cir. 2001); see

also Manhattan Cmty. Access Corp. v. Halleck, 587 U.S. 802, 809 (2019). "Section 1983's color-of-law prerequisite is synonymous with the more familiar state-action requirement applicable to Fourteenth Amendment claims, and the analysis for each is identical." Davison v. Randall, 912 F.3d 666, 679 (4th Cir. 2019) (quotation omitted); see Pitt Cnty. Mem'l Hosp., 572 F.3d at 180. Thus, for a private person or entity to be liable under section 1983, that person or entity's conduct must qualify as state action—i.e., the conduct must be "fairly attributable to the state." Davison, 912 F.3d at 679 (quotation omitted); see Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982); Holly v. Scott, 434 F.3d 287, 292 (4th Cir. 2006); Mentavlos, 249 F.3d at 310. Determining whether certain conduct qualifies as state action is not "a simple line between States and people operating outside formally governmental organizations." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001). Instead, the analysis requires "normative judgment" that examines the "totality of the circumstances" to determine whether "a sufficiently close nexus" exists between the private conduct and the state. Davison, 912 F.3d at 679–80 (quotations omitted); see Holly, 434 F.3d at 292; Mentavlos, 249 F.3d at 311–12. To constitute state action, the conduct "must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and "the party charged with the conduct must be a person who may fairly be said to be a state actor." Graham v. Evans, No. 5:19-CT-3102, 2022 WL 10986208, at *3 (E.D.N.C. Sept. 14, 2022) (unpublished) (quotation omitted), aff'd, No. 22-7191, 2023 WL 6410860 (4th Cir. Oct. 2, 2023) (per curiam) (unpublished); see Lugar, 457 U.S. at 937.

Defendants argue that the Symphony is not a state actor and that its actions are not attributable to the NCDNCR. See [D.E. 32] 17–20, 27–29; [D.E. 34] 19–25; [D.E. 45] 11–14; [D.E. 46] 7–12. Plaintiffs disagree.

The court has considered the governing legal standard. See, e.g., Brentwood Acad., 531 U.S. at 296 ("We have treated a nominally private entity as a state actor when it is controlled by an agency of the State." (quotation omitted)) (collecting cases); Sullivan, 526 U.S. at 52–58 (holding that "an insurer's decision to withhold payment and seek utilization review of the reasonableness and necessity of particular medical treatment is not fairly attributable to the State," even if the State encourages withholding payments); Rendell-Baker v. Kohn, 457 U.S. 830, 841–43 (1982) (holding that a school that received large government contracts to fund its students' tuition but was managed by a private board where the state has little involvement with the discharge of personnel is not a state actor); Pitt Cnty. Mem'l Hosp., 572 F.3d at 182–84; (holding no state action where the alleged actors were not employees of, or "controlled in the ordinary course of their decision making by," the county). Plaintiffs plausibly allege that the actions of the Symphony are fairly attributed to the State. See EOA §§ 6, 29, 88; Am. Compl. ¶¶ 11, 18, 20–22, 25, 27; [D.E. 28-10] 2. Plaintiffs plausibly allege that Haddock, an NCDNCR employee and the Director of Human Resources for the Symphony, and Macdonald, as part of the NCDNCR's leadership, were responsible for implementing the Symphony's COVID-19 vaccine policy and were state actors who were acting on behalf of the State. See Am Compl. ¶¶ 20, 22, 45, 53, 55. Moreover, plaintiffs plausibly allege that the Symphony's COVID-19 vaccination policies were jointly driven by the Symphony and the State and the State's decisions on funding. Cf. id. at ¶ 78.

The First Amendment's Free Exercise Clause states "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. It "protect[s] the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 524 (2022) (quotation omitted). The Free Exercise Clause "forbids the adoption of laws [or

policies] designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest." Booth v. Maryland, 327 F.3d 377, 380 (4th Cir. 2003); see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); Hines v. S.C. Dep't of Corrs., 148 F.3d 353, 357 (4th Cir. 1998). "[A] law [or policy] that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of the Lukumi, 508 U.S. at 531; see Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494 U.S. 872, 881–82 (1990), abrogated on other grounds by Religious Freedom Restoration Act of 1993, 42 U.S.C. §2000bb et. seq.; American Life League, Inc. v. Reno, 47 F.3d 642, 654 (4th Cir. 1995).

Nonetheless, "[t]he Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination." Booth, 327 F.3d at 380. Moreover, an otherwise generally applicable law or policy cannot "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." Fulton v. City of Philadelphia, 593 U.S. 522, 534 (2021); see, e.g., Church of the Lukumi, 508 U.S. at 524–28, 532; Lowe v. Mills, 68 F.4th 706, 714–15 (1st Cir. 2023), cert. denied, 144 S. Ct. 345 (2023).

Here, the vaccine policy itself appears to be neutral and has exemptions. See [D.E. 28-22]. Plaintiffs, however, plausibly allege that Macdonald wanted to promote a "vaccination 'culture.'" Am. Compl. ¶ 69. Plaintiffs also plausibly allege that the COVID-19 vaccine mandate lacks general applicability. Moreover, plaintiffs plausibly allege that the vaccine mandate only applied to employees but allowed unvaccinated patrons to attend performances if they adhered to specific protective procedures, which would similarly undermine the alleged vaccination culture. See id. at ¶ 62. Additionally, the policy provided an avenue for non-religious vaccine exemptions, which

the court infers shows a lack of general applicability. See [D.E. 28-22] 2 n.\*. Accordingly, viewing the allegations in the amended complaint in the light most favorable to plaintiffs, plaintiffs' Free Exercise Clause claim may proceed. See, e.g., Fulton, 593 U.S. at 532–34; Church of the Lukumi, 508 U.S. at 531–34; Gillette v. United States, 401 U.S. 437, 452 (1971); Lowe, 68 F.4th at 714–17; Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty., 915 F.3d 256, 265–66 (4th Cir. 2019); American Life League, Inc., 47 F.3d at 652; Berean Baptist Church v. Cooper, 460 F. Supp. 3d 651, 658–63 (E.D.N.C. 2020).

### D.

In count three, plaintiffs allege a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983 against the Symphony and Macdonald. See Am. Compl. ¶¶ 107–14. Plaintiffs allege both a discrimination claim and a failure-to-accommodate claim. See id. at ¶ 109.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To establish an equal protection claim, a plaintiff must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001) (citation omitted). Purposeful discrimination "implies that the decisionmaker . . . selected or affirmed the particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Admin. of Ma. v. Feeney, 442 U.S. 256, 279 (1979). If a plaintiff demonstrates intentional unequal treatment, the court must then determine whether the treatment is justified. See Morrison, 239 F.3d at 654. A plaintiff's claim of discrimination under section 1983 may be analyzed under the same standards developed in Title VII cases. See Causey v. Balog, 162 F.3d 795, 804 (4th Cir. 1998); Gholson v.

Benham, No. 3:14-CV-622, 2015 WL 2403594, at *8 (E.D. Va. May 19, 2015) (unpublished); Guseh v. N.C. Cent. Univ., 423 F. Supp. 2d 550, 559 (M.D.N.C. 2005), report & recommendation adopted, No. 1:04CV00042, 2006 WL 694621 (M.D.N.C. Mar. 13, 2006), aff'd sub nom. Guseh v. N.C. Cent. Univ. ex rel. Bd. of Governors of Univ. of N.C., 206 F. App'x 255 (4th Cir. 2006) (per curiam) (unpublished).

Plaintiffs plausibly allege an equal protection claim. Thus, the claim may proceed.

E.

In count four, plaintiffs allege wrongful discharge in violation of the public policy in the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.2 against the Symphony and Macdonald in her individual capacity. See Am. Compl. ¶¶ 115–18. In relevant part, the NCEEPA states that it is "the public policy of [North Carolina] to protect and safeguard the right and opportunity of all persons to seek, obtain[,] and hold employment without discrimination or abridgement on account of race . . . by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2. Plaintiffs allege religious discrimination in support of their North Carolina wrongful discharge claim. See Am. Compl. ¶¶ 117–18.

For this North Carolina law claim, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issue. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Twin

City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[3] A federal court, however, "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999). Moreover, in predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted).

Under North Carolina law, "the tort of wrongful discharge arises only in the context of employees at will." Doyle v. Asheville Orthopaedic Assocs., P.A., 148 N.C. App. 173, 174, 557 S.E.2d 577, 577 (2001) (quotation omitted); see Wagoner v. Elkin City Schs.' Bd. of Educ., 113 N.C. App. 579, 588, 440 S.E.2d 119, 125 (1994). Breach of contract, not wrongful discharge, is the proper claim for an employee "who is employed for a definite term or an employee subject to discharge only for 'just cause.'" Doyle, 148 N.C. App. 173, 174, 557 S.E.2d 577, 577 (quotation omitted); see Wagoner, 113 N.C. App. 579, 588, 440 S.E.2d 119, 125. Thus, under North Carolina law, a union employee subject to a collective bargaining agreement cannot bring a wrongful discharge claim. See, e.g., Trexler v. Norfolk S. Ry., 145 N.C. App. 466, 471–72, 550 S.E.2d 540, 543 (2001) (affirming the trial court's dismissal of a wrongful discharge claim for a union employee subject to a collective bargaining agreement); Claggett v. Wake Forest Univ., 126 N.C. App. 602, 611, 486 S.E.2d 443, 448 (1997) (affirming the trial court's dismissal of a wrongful discharge claim for a non-tenured tenure-track professor with a definite duration appointment); Wagoner, 113 N.C. App. 579, 588–89, 440 S.E.2d 119, 125 (affirming the trial court's dismissal

---

[3] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

of a wrongful discharge claim for a career teacher who could only be demoted or dismissed for reasons specified by North Carolina statute); Kingsdown, Inc. v. Hinshaw, No. 14 CVS 1701, 2016 WL 661823, at *9 (N.C. Super. Feb. 17, 2016) (unpublished) (dismissing a wrongful discharge claim for an employee promised employment until retirement); cf. Hill v. Medford, 158 N.C. App. 618, 626–27, 582 S.E.2d 325, 331 (2003) (Martin, J., dissenting), rev'd, 357 N.C. 650, 588 S.E.2d 467 (2003) (per curiam) (adopting dissent).

Plaintiffs were subject to individual one-year employment agreements. See Am. Compl. ¶ 58; [D.E. 28-28] 2–3; [D.E. 28-29] 2. The employment agreement was contingent upon compliance with the Symphony's COVID-19 vaccination policy. See Am. Compl. ¶ 58; [D.E. 28-28] 2–3; [D.E. 28-29] 2. The Symphony and the Union collectively bargained over the COVID-19 vaccination policy. See Am. Compl. ¶ 45; [D.E. 28-22]. If an individual was not vaccinated and did not receive an exemption by the end of the 2021–2022 season, then their job status would be "reviewed and [discussed] to determine what their long-term plans are with the [Symphony]." See [D.E. 28-22] ¶ 4. Thus, plaintiffs' employment was subject to the Symphony and the Union's collective bargaining agreement. Accordingly, because plaintiffs were union employees, employed for a definite term, plaintiffs fail to plausibly allege a wrongful discharge claim under North Carolina law. See, e.g., Trexler, 145 N.C. App. 466, 471–72, 550 S.E.2d 540, 54; Claggett, 126 N.C. App. 602, 611, 486 S.E.2d 443, 448.

In opposition, plaintiffs ask this court to disregard North Carolina Court of Appeals' precedent because the Supreme Court of North Carolina has not decided whether the tort of wrongful discharge is limited to at-will employees. See [D.E. 40] 66. Although plaintiffs cite other state supreme court decisions that contradict the North Carolina Court of Appeals' precedent, plaintiffs fail to present "persuasive data" that the Supreme Court of North Carolina "would decide

[the issue] differently." <u>Toloczko</u>, 728 F.3d 391, 398 (quotation omitted). Accordingly, the court dismisses plaintiffs' wrongful discharge claim against the Symphony and Macdonald.

IV.

In sum, the court (1) DISMISSES AS MOOT defendants' motions to dismiss the complaint [D.E. 22, 24], (2) GRANTS IN PART and DENIES IN PART defendant NCDNCR's motion to dismiss the amended complaint [D.E. 31], and (3) GRANTS IN PART and DENIES IN PART defendants the Symphony and Macdonald's motion to dismiss the amended complaint [D.E. 33]. The parties SHALL engage in a court-hosted mediation with United States Magistrate Judge Numbers.

SO ORDERED. This 26 day of September, 2024.

J̲A̲M̲E̲S̲ ̲C̲.̲ ̲D̲E̲V̲E̲R̲ ̲I̲I̲I̲
United States District Judge

40